**903**

Josephine GOSS et al.

v.

**BOARD OF EDUCATION, CITY OF
KNOXVILLE.**

Civ. A. No. 3984.

United States District Court
E. D. Tennessee, N. D.

June 7, 1967.

Carl A. Cowan, Knoxville, Tenn., Z.
Alexander Looby, Avon N. Williams, Jr.,

Nashville, Tenn., Jack Greenberg, New York City, for plaintiff.

S. Frank Fowler, Knoxville, Tenn., for defendants.

## MEMORANDUM

ROBERT L. TAYLOR, Chief Judge.

This case has had a long history. Seventeen students attending school in the Knoxville preparatory and school systems, joined by their parents or guardians, filed suit on December 11, 1959 against the Board of Education of the City of Knoxville, the Members of the School Board, Superintendent of Schools, and a number of principals of schools, seeking: an injunction against the defendant from refusing to admit or transfer them to the respective schools which they had sought to enter and which they were prevented from entering because they were members of the Negro race; an order declaring the policy and practices of defendants to be unconstitutional, in excluding plaintiffs and other persons similarly situated from the elementary or secondary schools of Knoxville because of their race pursuant to Article II, Section 12 of the Constitution of Tennessee, Section 49–3701, 49–3702 and 49–3703 of the Tennessee Code; an injunc-

tion prohibiting the defendants from engaging in any other actions that limit or affect admission to the Knoxville schools of the infant plaintiffs, or any Negro children similarly situated under defendants' jurisdiction; and, an order requiring the defendants to present to the Court a complete plan designed to bring about good faith compliance with the decision of the Supreme Court of the United States in Brown v. Board of Education, 347 U.S. 483, 74 S.Ct. 686, 98 L. Ed. 873, at the earliest practicable date throughout the public school system of the City of Knoxville and of Knox County which shall provide for a prompt and reasonable start towards desegregation of the public schools of said City and a systematic and effective method for achieving such desegregation, with all deliberate speed.

Following the answer of the defendants to the complaint, a hearing was had on February 8, 1960. An order was entered on that date by the Court directing the School Board to submit on or before April 8, 1960 a plan to bring about a good faith compliance with the decision in Brown v. Board of Education, supra. On April 8, 1960, the Board of Education complied with that order, and submitted a plan of desegregation called Plan 9.[1]

1. "1. Effective with the beginning of the 1960–61 school year racial segregation in Grade One of the Knoxville Public Schools is discontinued.

2. Effective for 1961–62 school year racial segregation shall be discontinued in Grade Two and thereafter in the next higher Grade at the beginning of each successive school year until the Desegregation Plan is effected in all twelve grades.

3. Each student entering a desegregated grade in the Knoxville Public Schools will be permitted to attend the school designated for the Zone in which he or she legally resides, subject to regulations that may be necessary in particular instances.

4. A plan of school zoning or districting based upon the location and capacity (size) of school buildings and the latest enrollment studies without reference to race will be established for the administration of the first grade and other grades as hereafter desegregated.

5. Requests for transfer of students in desegregated grades from the school of their Zone to another school will be given full consideration and will be granted when made in writing by parents or guardians or those acting in the position of parents, when good cause therefor is shown and then transfer is practicable, consistent with sound school administration.

6. The following will be regarded as some of the valid conditions to support requests for transfer:

a. When a white student would otherwise be required to attend a school previously serving colored students only;

b. When a colored student would otherwise be required to attend a school previously serving white students only;

c. When a student would otherwise be required to attend a school where the majority of students of that school or in his or her grade are of a different race."

Plaintiffs objected to the plan upon a number of grounds, the main one being that it did not provide for elimination of racial segregation as required by the Due Process and Equal Protection Clauses of the Fourteenth Amendment to the Constitution of the United States.

An extended evidentiary hearing was held on the objections to the plan on August 8, 9, 10, 11 and 12, 1960. On August 19, the Court filed a detailed memorandum approving the plan, with the single exception of the provision relating to technical and vocational courses offered in the Fulton High School to which Negro children would not have access, and directed the Board to submit a plan which would give the Negro students who desired technical and voca-

tional courses an opportunity to take them. (186 F.Supp. 559).

On September 2, 1960, plaintiffs filed a motion for a new trial and for appropriate relief from the operation of the judgment entered on August 26, 1960 pursuant to the memorandum opinion. On September 6, 1960 the Court entered an order denying the motion. An appeal was taken by plaintiffs following the denial of a new trial.

While the appeal was pending, defendants filed a plan to provide vocational and technical training for Negro students similar to those provided for white students at Fulton High School.[2]

Defendants also filed a statement entitled "Transfer Policy—Vocational Division—Knoxville City Schools—'Procedures.' "[3]

---

**2.** "1. Continue present general policy of providing vocational facilities at Austin High School and at Fulton High School when it is shown that fifteen or more properly qualified students are interested in the training.

2. When a course cannot be established at either Austin High School or Fulton High School because of lack of a sufficient number of qualified students, and the course is already available at the other school, the student or students may request and obtain transfer upon the terms as set out in the transfer policy now in effect in the Knoxville City Schools for vocational students, same being a part of this plan.

3. When a vocational facility is not already available at either Austin High School or Fulton High School, but a sufficient number of qualified students are available through a combination of students from the two schools, the new facility may be established at either school.

4. Factors to be used in deciding whether or not a new course is established.

(a) Number of qualified students as determined by Bulletin No. 1—"Administration of Vocational Education," Federal Security Agency, Office of Education. These are:

    1. 'The desire of the applicant for the vocational training offered;

    2. His probable ability to benefit by the instruction given; and

    3. His chances of securing employment in the occupation

after he has secured the training, or his need for training in the occupation in which he is already employed.' (Enrollment in vocational classes is limited to students who have reached their fourteenth birthday.)

(b) Availability of space to take care of the maximum as provided by the State Board of Vocational Education.

(c) Cost as determined by the Board of Education based upon availability of funds.

5. In the continued promotion of the vocational program in the Knoxville City Schools, the Board of Education will follow the rules and regulations as set forth from time to time by the State Board for Vocational Education.

6. The principals of the schools involved, the Director of Vocational Education, and the Superintendent acting on behalf of the Board of Education will be responsible for carrying out this plan consistent with sound school administration and without regard to race.

7. This plan is to become effective at the beginning of the school year, September, 1961."

**3.** "1. The student must indicate an interest in taking a vocational course.

2. The student fills out Form #235 in triplicate at least four weeks before the end of a school semester. (Copy of Form #235 is attached and made a part of this plan.)

3. The principal is responsible for seeing that at least one standardized voca-

The Sixth Circuit Court of Appeals in affirming this Court's judgment in some respects and in modifying it in others (301 F.2d 164), stated at page 168:

"In conclusion, we affirm the judgment of the District Court in the following respects: the approval of the plan insofar as it pertains to school grades already integrated; the approval of the plan as to items three and four thereof, providing for zoning or districting based upon location and capacity of school buildings and the permission of students to attend schools designated for their zones; the approval of the plan as to transfers subject to it being used for proper school administration purposes and not for perpetuation of segregation; the rejection of the plan so far as it pertains to Fulton High School and the order to the board to resubmit a plan in a reasonable time that will permit Negro students to have the advantage of the special courses of that high school and the denial of injunctive relief.

"We modify the judgment of the District Court insofar as it approved the board's plan for continued segregation of all grades not reached by its grade-a-year plan. It is not the function of this Court to formulate or dictate to the board a plan for the operation of the Knoxville schools. It is, likewise, not our intention to require immediate total desegregation. We do believe, however, that more grades than contemplated by the board's plan should now be desegregated. In the light of the board's experience with the present plan, it should be enabled to submit an amended plan that will accelerate desegregation and more nearly comply with the mandate of the Supreme Court for 'good faith compliance at the earliest practicable date.'

"The case is remanded to the District Court with instructions to require the board to promptly submit an amended and realistic plan for the acceleration of desegregation, in accordance with the views herein expressed."

tional aptitude test is given the student and that the results are recorded on Form #235.

4. Parents will be furnished a description of the vocational courses. A copy of Form #235 (the transferring document) must be approved by the parents. A statement that the student transferring intends to remain in the new school for a period of at least one school semester, contingent upon the student being able to profit by the course offered, must also be approved by the parents.

5. If the parent signs Form #235 approving the transfer, the principal will review the application, confer with the attendance worker and either approve or disapprove the transfer, writing into the record his reason, or reasons, for disapproval.

6. The student is required to fill out Form #206 (the official Enrollment Card), omitting only the schedule section of said card. (Copy of Form #206 is attached and made a part of this plan.)

7. Forms #206 and #235, along with the students cumulative card shall be sent to the Attendance Department for endorsement.

8. Forms #206 and #235, along with the student's cumulative card, will then be forwarded to the receiving principal.

9. The principal of the receiving school, after reviewing the student's record, either accepts or rejects the transfer, setting out in writing the reason or reasons, for rejection.

10. An appeal from the decision of the sending principal or of the receiving principal may be made to the Superintendent by the student requesting the transfer. An appeal from the decision of the Superintendent may be made to the Board of Education. Said appeal to the Superintendent shall be filed in writing with the Superintendent within four weeks after the student has received notice of the decision of the principal from which the appeal is taken. The appeal from the Superintendent's decision must be filed in writing with the secretary of the Board of Education within two weeks after the student receives notice of the Superintendent's decision.

11. No student will be accepted at either Austin High School or Fulton High School without following the above transfer procedure. (The requirement in Item #2 above shall not apply to a new student who becomes a legal resident of the City of Knoxville after deadline referred to in said item.)"

Plaintiffs' petition for certiorari was granted and this case was heard by the Supreme Court on March 20, 21, 1963 along with a case from Davidson County involving a similar question, and was decided by it on June 3, 1963. (373 U.S. 683, 83 S.Ct. 1405, 10 L.Ed.2d 632). In the *Goss* case, the Supreme Court considered only Section 6 of the plan, which was the transfer section (supra, Footnote 1). This Section the Supreme Court held invalid because it promoted racial discrimination. It observed that transfers are available to those who choose to attend school where their race is in the majority, but that there was no provision whereby a student might transfer upon request to a school in which his race was in the minority, unless he qualified for a good cause transfer. The Court further observed:

"This is not to say that appropriate transfer provisions, upon the parents' request, consistent with sound school administration and not based upon any state-imposed racial conditions, would fall. Likewise, we would have a different case here if the transfer provisions were unrestricted, allowing transfers to or from any school regardless of the race of the majority therein. But no official transfer plan or provision of which racial segregation is the inevitable consequence may stand under the Fourteenth Amendment." pp. 688, 689, 83 S.Ct. p. 1409.

The Board submitted a plan for Fulton Vocational High School on March 31, 1961 and an evidentiary hearing was held by this Court thereon. The Court in a memorandum opinion rendered on June 19, 1961 approved the plan with the single reservation that: "A student who lives near Fulton and who possesses the necessary vocational qualifications to enter Fulton should not be required to travel across town to attend Austin when Fulton is much nearer."

Plaintiffs' second appeal involving the Fulton School was decided by the Court of Appeals on July 6, 1962 (305 F.2d 523), in which this Court was affirmed in approving the plan except insofar as it pertained to the transfer procedures. The case was remanded by the appellate court with instructions to require an amendment that would permit all students to transfer as a matter of right when they qualified for the courses which they desired to take in one of the two high schools involved (Fulton and Austin), and such course was not available to them in the school they were attending.

On June 18, 1962 plaintiffs filed a motion to require defendants to file immediately a supplemental plan for accelerating desegregation of the City Schools of Knoxville as of the beginning of the 1962–63 academic school year, in accordance with the mandate of the Court of Appeals for the Sixth Circuit filed in this Court on June 8, 1962.

On June 25, 1962 the Board stepped up the integration schedule so as to include the fourth grade, as well as the third, effective September 1, 1962.

Plaintiffs filed objections to the amended plan and urged in support a number of grounds and requested that the case be advanced on the docket for an immediate hearing on the objections.

On March 14, 1963 the plan was further amended so as to desegregate the fifth and sixth grades, effective with the school year 1963–64. Objections were filed to this plan. The Board desegregated the summer junior and senior daytime high schools to be held at Tyson Junior High School and West High School beginning June, 1963 so that anyone could attend these schools on the basis of his or her record and qualifications, without regard to race.

The hearing was held on the amendments to the plan on April 1, 1963 and this Court held that desegregation of the fifth and sixth grades complied with the mandate of the Court of Appeals. The Board was ordered to file an amended plan with respect to the Fulton High School showing that it had complied with the mandate. The Board was directed to make schools available to all retarded children.

The Board submitted a plan on May 15, 1963 regarding Austin and Fulton High Schools, and regarding schools for retarded children.

On February 28, 1964, the Sixth Circuit Court of Appeals entered the following order on what appears to have been plaintiffs' third appeal:

"Upon the statement of the attorney for the defendants-appellees to the effect that the Board of Education of the City of Knoxville, Tennessee has decided to file by June 5, 1964 a plan to eliminate all racially discriminatory practices in all grades, programs and facilities of the Knoxville Public School System not later than the time that regular school sessions begin in September, 1964, the appeal is dismissed and the case remanded for further proceedings in the District Court effectuating said decision."

Following this order, this Court directed the Board to file by June 5, 1964 a plan as proposed by it in the hearing before the Court of Appeals, which plan would be effective by the time the regular school sessions began in September, 1964.

On May 11, the Board filed a plan adopted on May 11, 1964 providing for complete desegregation of the public schools of Knoxville. Plaintiffs objected to this plan on June 11, 1964 upon the ground that it did not meet the requirements of the Fourteenth Amendment to the Federal Constitution and urged in support of its objections six separate grounds.

The Court advised counsel on more than one occasion that it desired a hearing on these objections. Counsel advised the Court that they felt all matters would be settled between the plaintiffs and the School Board except the provision of the plan relating to transfers, and that there was a possibility of agreement on this provision.

But on January 21, defendants moved for a pre-trial conference. Such conference was held on February 5, 1965 and an order entered pursuant thereto on February 12, 1965, approved by the attorneys for the respective parties. Paragraphs 1 and 5 of the plan were amended and Paragraph 6 was added. The amended plan for complete desegregation was filed on February 16, 1965, as follows:

"1. Effective with the beginning of the school year in September, 1964, all racially discriminatory practices in all grades, programs and facilities of the Knoxville Public School System shall be eliminated and abolished. Without limiting the generality and effectiveness of the foregoing, all teachers, principals and other school personnel shall be employed by defendants and assigned or re-assigned to schools on the basis of educational need and other academic considerations, and without regard to race or color of the persons to be assigned, and without regard to the race or color of the children attending the particular school or class within a school to which the person is to be assigned. No transfer or re-transfer of a teacher, principal or other school personnel may be granted or required for considerations based upon race and color and no assignment or re-assignment of such teacher, principal or other school personnel may be made for considerations based upon race or color.

"All tenure and seniority rights are to be observed and the defendants will not utilize or attempt to utilize the provisions of the State Teacher Tenure Law or any other law, custom or regulation conferring discretion upon them in the employment and discharge of teachers or the abolition of teaching positions in such manner as to discriminate either directly or indirectly on account of race or color in the employment, discharge, re-employment, assignment, or re-assignment of teachers, principals or other school personnel in the Knoxville City School System.

"2. Each student will be assigned to the school designated for the district in which he or she legally resides,

subject to variations due to overcrowding and other transfers for cause.

"3. A plan of school districting based upon the location and capacity (size) of school buildings and the latest enrollment studies will be followed subject to modifications from time to time as required.

"4. Requests for transfer of students from the school of their district to another school will be given full consideration and will be granted when made in writing by parents or guardians or those acting in the position of parents, when good cause therefor is shown and when transfer is practicable, consistent with sound school administration.

"5. Students may request transfer to or enrollment in any vocational or technical facility sponsored by the Knoxville City Board of Education and will be accepted subject to requirements respecting aptitude, ability, pretraining, physical condition, age, and other considerations including adequacy of facilities.

"6. The Board of Education recognizes the continuation of jurisdiction of the United States District Court for the Eastern District of Tennessee, Northern Division, at Knoxville of this Board and the matters involved in this plan, until termination of said jurisdiction by express direction of said court."

Plaintiffs filed objections to Paragraphs 2, 3 and 4 of this plan on February 23, 1965.

On July 28, 1965 a pre-trial conference was held on the plan and an order entered pursuant thereto on July 30, 1965. Paragraph 3 of the February 16, 1965 plan, as amended by statement of the Board on April 19, 1965, was stricken and the following transfer plan substituted:

"Upon written application, students may be permitted to transfer to schools outside their assigned attendance zones only in exceptional cases for objective administrative reasons and no transfer shall be granted, denied or required because of race or color."

The plan was further amended by striking Paragraph 4 and substituting the following provision relating to transfers:

"All applications of students for transfers to schools outside their assigned attendance zones shall be considered, and approved by the Superintendent of Schools at his discretion, pursuant to recommendation of the Director of the Department of Child Personnel after due investigation and consideration of the Department of Child Personnel."

The Board was ordered to file the plan in a single document and to publicize the provisions of the plan of desegregation as modified so that pupils and parents would be more fully informed. The order further recited that:

"The Plaintiffs' last Specifications of Objections to said Plan of Desegregation, in Paragraph 1 thereof, attacked upon constitutional grounds paragraph 1 of the statement of the Board of Education of April 19, 1965, in which the Board of Education set out a Plan for permissive continued enrollment of pupils in the year 1965–66 and thereafter in the schools attended in the previous year. This remains as an unresolved issue in this case. The Court informed Counsel that a trial on that issue may be had on August 3, 1965, but Counsel for the Plaintiffs stated that it would be impossible for Plaintiffs to prepare for trial upon such short notice, and that Plaintiffs wish to preserve their right of attack upon said provision of the Plan. The trial of this issue is deferred to such time as the Court can find an open date; and in the meantime the defendants are fully authorized to follow the Plan of Desegregation as presented relative to the school year 1965–66, but giving effect to the modifications ordered above."

Thus, as shown by the foregoing order which was approved by the attorneys for the respective parties, the unresolved is-

sue in the case was the validity of the Board's action, as set out in the plan, "for permissive continued enrollment of pupils in the year 1965–66 and thereafter in the schools attended in the previous year."

A detailed statement of the plan was filed in conformity with the order of July 30, 1965 on August 6, 1965.[4]

The Court called the case for hearing at its regular December, 1965 term of court and at its regular May, 1966 term, but was advised that there was only one issue to be resolved and that the parties felt there was a possibility of resolving this issue and that they desired more time. At the joint suggestion of the parties, the case was not set for trial on the merits at either of these terms of court.

Plaintiffs filed an amendment to their objections to the amended plan for complete segregation on January 19, 1966, in which they objected to the brother-sister transfer provision.

During the sounding of the December, 1966 docket, the one issue, that involving the brother-sister transfer provision, not having been resolved, the Court set the case for trial on the merits for March

---

4. "1. Effective with the beginning of the school year in September, 1964, all racially discriminatory practices in all grades, programs and facilities of the Knoxville Public School System shall be eliminated and abolished. Without limiting the generality and effectiveness of the foregoing, all teachers, principals and other school personnel shall be employed by defendants and assigned or re-assigned to schools on the basis of educational need and other academic considerations, and without regard to race or color of the persons to be assigned, and without regard to the race or color of the children attending the particular school or class within a school to which the person is to be assigned. No transfer or re-transfer of a teacher, principal or other school personnel may be granted or required for considerations based upon race and color and no assignment or re-assignment of such teacher, principal or other school personnel may be made for considerations based upon race or color.

"All tenure and seniority rights are to be observed and the defendants will not utilize or attempt to utilize the provisions of the State Teacher Tenure Law or any other law, custom or regulation conferring discretion upon them in the employment and discharge of teachers or the abolition of teaching positions in such manner as to discriminate either directly or indirectly on account of race or color in the employment, discharge, re-employment, assignment, or re-assignment of teachers, principals or other school personnel in the Knoxville City School System.

"2. Each student will be assigned to the school designated for the district in which he or she legally resides, subject to variations due to overcrowding and other transfers for cause, and the Super-intendent may permit continued enrollment of students in their present schools until completion of the grade requirements for said school, provided this is consistent with sound school administrative policy.

"3. A plan of school districting based upon the location and capacity (size) of school buildings and the latest enrollment studies will be followed subject to modifications from time to time as required. (Zone maps and typed statements of Zone boundaries were filed in this case April 27, 1965.)

"4. Upon written application, students may be permitted to transfer to schools outside their assigned attendance zones only in exceptional cases for objective administrative reasons and no transfers shall be granted, denied or required because of race or color. All applications of students for transfers to schools outside their assigned attendance zones shall be considered and approved by the Superintendent of Schools pursuant to recommendation of the Director of the Department of Child Personnel after due investigation and consideration of the Department of Child Personnel.

"5. Students may request transfer to or enrollment in any vocational or technical facility sponsored by the Knoxville City Board of Education and will be accepted subject to requirements respecting aptitude, ability, pre-training, physical condition, age, and other considerations including adequacy of facilities.

"6. The Board of Education recognizes the continuation of jurisdiction of the United States District Court for the Eastern District of Tennessee, Northern Division, at Knoxville of this Board and the matters involved in this plan, until termination of said jurisdiction by express direction of said court."

31, 1967. At the instance of counsel, the case was continued until May 11, 1967. In the meantime, another pre-trial was held on March 10, 1967 and an order entered pursuant thereto.

Plaintiffs contend. in their theories as set forth in the pre-trial order that the provision giving the children who were presently enrolled in schools an option to remain in those schools until they completed their grade requirements promoted segregation.

The rule that permitted the younger brother or sister of a child to enroll in the school where the older member attended was objected to for the same reason. Plaintiffs stated that a hearing should be held on the question whether the plan had in its operation been effective in eliminating discrimination in the school system in compliance with the constitutional requirement.

It is the theory of the defendants, as set forth in the pretrial order, that where a pupil becomes a student in a particular school, as for instance a junior high school, the interests of his education are promoted by permitting him to retain whatever outside activity places he has obtained, by remaining in that school even though he resides in a different zone from that of the school he attends.

Defendants further contended that the brother-sister provision should be retained because of transportation problems involved with families having children attending different schools and other conveniences to the families and students. Defendants contended that the plan as a whole has been effective in its operation in the elimination of discrimination in the school system and that it complies with constitutional requirements.

The three issues set forth in the pretrial order were:

(1) Whether the grade requirement provision, enabling students to continue in their present school until graduation, complied with the Fourteenth Amendment.

(2) Whether the rule permitting children of the same family to transfer to and attend schools out of their zones of residence where a brother or sister might be otherwise required to attend different schools, violates the Fourteenth Amendment.

(3) Whether the operation of the plan complied with the Fourteenth Amendment in relation to Issues 1 and 2.

Plaintiffs submitted a modification to the pre-trial order on March 10, in which they requested that Issue No. 3 be deleted and the following inserted:

"(3) Whether or not the Knoxville Public School System is effectively desegregated in compliance with the Fourteenth Amendment to the Constitution of the United States in relation to 1) Pupil Assignment, 2) Faculty, 3) Administrative Staff and Clerks, 4) Principal Clerks, 5) Maintenance and Operation Personnel, 6) School Programming, 7) Organization and Curriculum, 8) Extra-Curricula Activities, 9) Facilities and New Construction and 10) School Boundaries or Zone Lines."

The Court denied the request as it related to the matters numbered 3 to 10 unless plaintiffs furnished citations of authority pointing out cases in which the courts had dealt with such matters.

Plaintiffs excepted to the pre-trial order as modified on March 27, 1967 and on May 1, 1967 submitted a statement of the cases relied upon in conformity with the modified pre-trial order.

Plaintiffs' motion to further modify the amended pre-trial of March 10, as modified on March 15, was denied.

On May 8, plaintiffs filed a 7½ page motion entitled "Motion for Further Relief." It is largely a repetition of the motion and objections and exceptions previously filed, except that it stated the defendants had planned and were planning the construction of new schools and school facilities in such manner and locations that would adhere to and increase segregated racial residential patterns and would maintain and perpetuate racial segregation and that defendants had drawn and continued to maintain and

enforce school boundaries or zone lines which are gerrymandered according to race and which disregarded sound principles of school administration relating to school capacity.

Plaintiffs asked that the Board: provide a system that would effect an equitable distribution of Negro and white faculty and staff members in each school and provide a plan of employment of supervisory and professional staff, administrative staff, clerks, maintenance and operation personnel, in such a manner that the racial segregation, exclusion and discrimination, which plaintiffs claim now exists, be disestablished and that there be equitable distribution of Negro employees; provide a plan of programming, organization and extra-curricular activities designed to disestablish all existing racial and socio-economic segregation and discrimination in the system; and establish a plan of new school construction which shall be based not upon racial or socio-economic residential patterns, but which shall be based upon, and provide for both the present and future, an equitable distribution of racial and socio-economic elements in the population of each school in the school system.

A full evidentiary hearing was held in which the parties were permitted to introduce proof relating to all the issues set forth in the pre-trial order of March 10, as modified by order of March 15. A comparatively large record was made consisting of hundreds of pages of exhibits, including maps, charts, documents pertaining to transfers, school building surveys, annual statistical reports of the Superintendent, insurance reports, desegregation of teaching personnel, classification of students, school expansion programs, etc.

One of the attorneys for the plaintiffs, in his argument, stated that there were two questions for the determination of the Court, namely, whether the grade requirement rule and the brother-sister rule that permitted some students to attend school out of the zone in which they lived, met constitutional requirements and whether the plan which has

been in effect with some modifications since the 1960–61 school year, which started out with what is known as the stair-step desegregation, namely, a grade-a-year plan, and ripened into a plan of full desegregation beginning in the school year 1964–65, is operated so as to perpetuate segregation in violation of the Fourteenth Amendment to the Constitution of the United States.

*Completion of Grade Requirement*

This rule became effective for the school year 1965–66 and will expire by its own terms within three years from that date. Transfers under this plan amount to around six per cent of the entire student body of 37,220 students. The rule authorizes the Superintendent of Schools to continue enrollment of students in their present schools until completion of the grade requirement for said schools, providing this is consistent with sound administration. Those who testified on the subject stated that this was a rule that was very important in the administration of the schools. If the rule were changed, it would reduce the number of Negroes attending white schools according to Dr. Bedell. The Negroes have been permitted to go to the school of their choice. The rule has not been used to promote segregation. It is not mandatory, but operates only upon the student's application. A student who is forced to leave the school he first chooses would sacrifice the beneficial association that he has made with his classmates, and would sever his connection with extra-curricular activities in which he has participated in that school such as football, basketball or baseball, Glee Club, dramatic club or band activity, or other valuable relationships which he has made.

A like provision was approved by the Court in the case of Monroe v. Board of Commissioners of City of Jackson, Miss., 221 F.Supp. 968 (1963), and approved again in the same case at 244 F.Supp. 353 (July 30, 1965).

The preponderance of the evidence shows, and the Court finds, that

this provision of the plan is not used to promote segregation and is, therefore, valid.

School Board Policy Adopted August 23, 1965, Permitting Younger Children to Transfer to Schools Out of Their Zone of Residence Where an Older Brother or Sister is Attending

The School Board adopted a resolution on August 23, 1965 which permitted a younger child to go out of his zone of residence to attend his older brother or sister's school.

This rule was made at the time of the City's annexation which brought into the City Limits the Rocky Hill School. At that time, older members of the family who lived in the Rocky Hill zone were attending school in Bearden. Under the zone requirement, the younger members would have been required to go to Rocky Hill. This would have presented a transportation inconvenience and expense for the parents in forcing them to take their children to two different schools. The Board was advised by counsel that there was no racial implication in allowing all members of the family to attend the same school. This prompted the Board to pass a resolution reciting that it was the policy of the Board that the younger child be placed in the same school where an older one was. Defendants conceded that if this rule were carried out to promote segregation it would be invalid.

A similar mandatory rule was condemned in Ross v. Dyer, 312 F.2d 191 (C.A.5). In that case it was used to perpetuate segregation and was rightfully condemned.

■ This Court can visualize instances in which both economic hardship and serious inconvenience would result if the younger child were not permitted to attend the same school which their older brothers and sisters attend. The proof shows that if this provision is eliminated, it will promote desegregation in some instances and in some instances it will not. The proof further shows that it is not operated to promote segregation but is operated for the benefit of the parents

and students. The transfers under this provision involved around one percent of the students only.

This brings us to a third issue, namely, whether the Board has operated the plan as modified to promote segregation in violation of the Fourteenth Amendment.

The items which plaintiffs raised under this issue were many. They contended that the zone lines were made to promote segregation. These lines were in the plans that were approved by this Court and were reviewed by the Sixth Circuit on at least two appeals and presumably were either not attacked or were impliedly approved by the Supreme Court of the United States when it considered and remanded the case to the Court of Appeals by holding that the transfer plan involving the minority-majority rule was unconstitutional. This day is late for making a claim that the zones are unconstitutional because they promote segregation.

The Knoxville School System is known as the neighborhood system. The neighborhood school has been approved by various courts, including our own Circuit.

The great and convincing preponderance of the proof shows that the zones were not made to promote segregation. The effect of the testimony of Dr. Osborne was that the zones were not intentionally gerrymandered, but that in many instances they promoted segregation.

Doctor Adams stated that the zone lines were designed to fill school buildings. The population is moving from the interior of the town and towards the suburbs. This factor was taken into consideration in planning the new school buildings at Bearden and Fountain City. The University of Tennessee is now making a study of the Knoxville School program and school plans. Dr. Adams stated: that the school structure in Knoxville was more complicated than in many other places; that one of its purposes was to desegregate teachers and that they were desegregating teachers; that they were also pushing desegrega-

tion of staff as fast as possible within reason; that it was the Board's policy to hire people on account of ability and competency; that equal opportunity for occupational jobs is given proper consideration although he has not had an opportunity to do much about it in the past two years because of dollar restrictions; and that the intra school activities are desegregated.

■ It was held in the case of Mapp v. Board of Education of City of Chattanooga, Tennessee, 319 F.2d 571 at 576 (C.A. 6), that school personnel other than teachers and principals cannot be considered in a class action brought by students. The Court referred the case back to the District Court to consider faculty desegregation only. See Bradley v. School Board of City of Richmond, 382 U.S. 103, 86 S.Ct. 224, 15 L.Ed.2d 187. The present suit is a class action brought by students and parents and precludes consideration of school personnel other than faculty.

■ The neighborhood school system, if used to discriminate against Negroes, has been held to be unconstitutional. E. G., Norwood v. Tucker, 287 F.2d 798 (C.A. 8); Northcross v. Board of Education of City of Memphis, Tenn., 302 F.2d 818 (C.A. 6); Green v. School Board of City of Roanoke, Virginia, 304 F.2d 118 (C.A. 4); Dodson v. School Board of City of Charlottesville, 289 F.2d 439 (C.A. 4). On the other hand, these same cases recognize the principle that in the absence of a showing that such school systems are being used to deprive a student of his constitutional rights, they are not objectionable on constitutional grounds. Downs v. Board of Education of Kansas City, 336 F.2d 988, 995 (C.A. 10).

Some of the facts in *Downs* are similar to those found here. In that case, there was a racial imbalance in the public schools of Kansas City, where there was a total of 7,467 Negro children in the elementary, junior high and senior high schools. Almost 73 per cent of these children, or 5,405, attended the nine schools which were predominantly Negro.

The remaining 27 per cent, or 2,062, attended 26 integrated schools. The schools located nearest to the concentration of Negro population had the highest percentage of Negro pupils and the schools the farthest away from that concentration were composed entirely of white students. Thus, while there were some schools having an all Negro student body and some having an all white student body, there were also 26 of the Kansas City schools which had both Negro and white students. The superintendent of schools testified that the school attendance districts were laid out without regard to race and upon the basis of geography, school capacity and number of children residing in the district.

The Court held that there was no basis in fact for the appellants' contention that the evidence established "a clear pattern of deliberate use of zone lines and assignment regulations to insure the continued operation of a dual school system." All of the evidence was to the contrary and the trial court so found, saying that the boundary lines after 1954 were set on the basis of building location and after population studies indicated the predictable pupil loads which the various buildings could accommodate. The Court further held that the drawing of school zone lines was a discretionary function of a school board and would be reviewed only to determine whether the school board acted arbitrarily.

The Court observed that it was true that the staffs of the various schools were either all white, as is the case in white and integrated schools, or all Negro. But, the appellants did not, by their complaint or evidence, seek to have the staffs desegregated. Furthermore, they did not cite and the Court did not find any case holding that such a policy, in and of itself, was sufficient to establish a discriminatory intent on the part of the Board.

The Court further observed that none of the factors relied upon by appellants, when considered alone, was sufficient to establish a denial of their constitutional

right not to be discriminated against because of race or color; that the crucial question was whether all of those factors considered together were sufficient to establish such a denial.

The Court held that there was no evidence of intentional gerrymandering of the school attendance districts, no intentional use of a dual school system, no assignment of pupils according to racial factors nor any other schemes or devices condemned in the cases. It was concluded that the Kansas City school system met the "minimal requirements for nonracial schools" or "geographic zoning, according to the capacity and facilities of the buildings and admission to a school according to residence as a matter of right."

Appellants also contended in the *Downs* case that even though the Board may not have been pursuing a policy of intentional segregation, there was still segregation in fact in the school system and under the principles of Brown v. Board of Education, the Board had the positive and affirmative duty to eliminate segregation in fact as well as segregation by intention. The Court observed that while there seemed to be some authority to support that contention, the better rule was that although the Fourteenth Amendmen prohibits segregation, it does not command integration of the races in the public schools, and that Negro children had no constitutional right to have white children attend school with them. The Court concluded by saying that the question was conclusively answered in Bell v. School City of Gary, Indiana, 324 F.2d 209, 218 (C.A. 7) where the court held that "there is no affirmative U.S. Constitutional duty to change innocently arrived at school attendance districts by the mere fact that shifts in population either increase or decrease the percentage of either Negro or white pupils." It concluded that the decision in *Brown* and the many cases following it, would not require a school board to destroy or abandon a school system developed on the neighborhood school plan, even though it resulted in a racial imbalance of the

students within the schools, where the districts in the school system had been honestly and conscientiously arrived at with no intention or purpose of maintaining or perpetuating segregation. Downs v. Board of Education of Kansas City, supra, 336 F.2d 994–998.

Returning again to our case, Doctor Osborne testified for plaintiffs that some of the zone lines perpetuated segregation because housing projects, economic status and possibly other factors caused Negroes to locate in neighborhoods confined to their own race. He put much stress on the Coleman report in his testimony. He made it clear that he did not intend to convey the idea that the School Board and school officials had prepared the zone lines for the purpose, and with the intent, of promoting segregation.

Doctor Bedell testified for defendants that the zone lines were inaugurated in 1963 and that the schools were located as near to children as possible to avoid the hazards of transportation. He further stated that Negroes had been permitted to attend the schools of their choice.

The Court finds that in 1965, three small Negro schools were closed; that in 1961, eight schools were desegregated with 30 Negro students attending eight formerly white schools; that in 1962, 21 Negroes were attending desegregated schools; in 1962–63, 84; in 1964, 13 formerly white schools were attended by 253 Negro children; in 1964–65, 29 formerly white schools were attended by 717 Negro children; in 1965–66, 1195 and that in the seventh month of the school year 1967, 31 formerly white schools were attended by 1783 Negroes.

It finds that in the school year 1960–61, the Knoxville School System had 41 schools—23 were all Caucasian, 10 all Negro and 8 integrated. In the first school year after annexation, 1963–64, the system had a total of 68 schools—43 all Caucasian, 12 all Negro, and 13 integrated. In the school year 1964–65, the number of integrated schools increased to 29, in the next school year of 1965–66 it increased to 33, and the num-

ber increased to 38 in the school year 1966–67. The number of all Caucasian schools dropped from 43 in 1963–64 to 21 in the current school year. The number of all-Negro schools dropped from 12 in 1963–64 to 5 in 1966–67.

It further finds that the total student enrollment in 1966–67 is 37,220 students, of which 5,615 are Negroes, or about 15 per cent of the total enrollment. Of these 5,615 Negroes, there are 4,641 or 82.6 per cent, of the Negro children in attendance at a school in which there is at least one Caucasian child.

It finds that in the school year 1963–64, all of the twelve grades were desegregated. All schools above the seventh grade have Negroes; that despite concentration of Negro residences, including large Federal housing centers, in the school year 1966–67 32 per cent of the Negro students in the Knoxville Public School System, amounting to 1,743 in number, attended schools in which white students either predominated or were in equal balance with Negro students, and in each such instance there was a substantial number of Negroes so that the benefits of educational integration were favorably presented for the students of both races. These schools and the number of Negroes in attendance were Bearden—63, Beaumont—35, Belle Morris—50, Brownlow—24, Cedar Grove —30, Fair Garden—291, Lincoln Park— 21, Lonsdale—13, Moses—31, Park Lowry—338, Pond Gap—13, Ridgedale —31, Smithwood—37, Bearden High— 32, Christenberry Junior High School— 20, East High School—350, Fulton High School—62, Park Junior High School— 104, Rule Junior High School—157, West High School—41.

It finds that staff integration began in 1965–66 with 11 schools having integrated staffs. In 1966–67, 35 of 64 schools, or 54.6 per cent of the schools, had integrated staffs. There is no Negro principal in a white school and no white principal in a Negro school. The schools were developed under the community concept and the zone lines followed community patterns. There are 29 Negro

teachers assigned to white schools and 10 white teachers assigned to Negro schools.

The Court finds that after a slow start, the Board of Education and School Administration have moved with commendable zeal, conscientiousness and results toward the integration of the schools and faculties in an enormously complex situation. Knoxville is a town divided geographically on the south by a river with only three bridges across it, by a system of ridges on the north with a limited number of transportation routes therethrough, and by railroad systems quartering the town north and south, east and west, with multiple, hazardous grade crossings. The complexity has been heightened by the tendency of Negroes to live in two large, well-defined areas in the town rather than dispersed over it, by large urban renewal programs which displace portions of the population resulting in wholesale and unpredictable removals to other areas of the town, by the annexation of a large area of the County, since the beginning of this suit, whose students and schools have had to be absorbed into the City School System, by heavy increases in population necessitating a building program with crucial decisions as to building sites in the light of the geographical barriers and other factors involving population concentration and movements.

The Court finds that the above considerations are further complicated by serious budgetary limitations and fiscal complications, and by the fact that the Negro population itself constitutes but 15% of the whole, a fact, when figures alone are used, which tends to obscure what is actually a vigorous, straight-forward and expertly managed program of integration.

The Court is of the opinion that there is no constitutional duty on the part of the school board to bus Negro or white children out of their neighborhoods or to transfer classes for the sole purpose of alleviating racial imbalance which it did not cause, nor is there a duty to select new school sites solely in

furtherance of such purpose. Deal v. Cincinnati Board of Education, 369 F.2d 55, 61 (C.A. 6); Gilliam v. School Board of City of Hopewell, 345 F.2d 325 (C.A. 4).

"In dealing with the multitude of local situations that must be considered and the even greater number of individual students involved, we believe it is the wiser course to allow for the flexibility, imagination and creativity of local school boards in providing for equal opportunity in education for all students. It would be a mistake for the courts to read Brown in such a way as to impose one particular concept of educational administration as the only permissible method of insuring equality consistent with sound educational practice. We are of the view that there may be a variety of permissible means to the goal of equal opportunity, and that room for reasonable men of good will to solve these complex community problems must be preserved  \*  \*  \*"

\*     \*     \*     \*     \*     \*

"Moreover, our refusal to restrict the school board with a mathematically certain formula for the vindication of individual constitutional rights is not an innovation. The right to a trial by an impartial, fairly selected jury, is well established in our law and it has been protected against the same sort of disguised racial discrimination that has been attempted in the school desegregation cases. \* \*"

\*     \*     \*     \*     \*     \*

"Appellants' right to relief depends on a showing of more than mere statistical imbalance in the Cincinnati schools. They must also expose that added quantum of discriminatory state action which deprives them of their constitutional right to freedom of choice. If the school officials, through overt practice or by subterfuge, have treated students differently solely because of race, then they not only must cease doing so, but also must take affirmative action to remedy the condition which they have caused. Thus,

even if the Negro students were distributed uniformly in the schools, if other forms of discrimination were used against them they would still be entitled to the aid of the law. When no discrimination is shown, racial imbalance alone is no warrant for relief." Deal v. Cincinnati Board of Education, supra, 369 F.2d pp. 61, 62, 63.

See Downs v. Board of Education, supra; Bell v. School City of Gary, Indiana, supra, and Springfield School Committee v. Barksdale, 348 F.2d 261, 264 (C.A. 1).

The district judge's denial of a preliminary injunction enjoining further construction of new elementary schools in the Cleveland school system was affirmed. Craggett v. Board of Education of Cleveland, 338 F.2d 941 (C.A. 6).

■ The Court is of the opinion that a school district offends no constitutional requirements when it grants to all students uniformly an unrestricted freedom of choice (regardless of zoning) as to schools attended so that each pupil in effect assigns himself to the school he wishes to attend. Bradley v. School Board of City of Richmond, Va., 345 F.2d 310 (C.A. 4); Wheeler v. Durham City Board of Education, 346 F.2d 768 (C.A. 4); Goss v. Board of Education, 373 U.S. 683, 688–689, 83 S.Ct. 1405, 10 L.Ed.2d 632; Northcross v. Board of Education of City of Memphis, 333 F.2d 661, 665 (C.A. 6).

■■ The drawing of zone lines is a discretionary function of the school board. Where challenged, the burden of proof is on the school board to demonstrate that zone lines of each school were not drawn with a view to preserve a maximum amount of segregation. Northcross v. Board of Education of City of Memphis, supra, 665. The Board has met the burden and one of plaintiffs' witnesses conceded there was no intentional gerrymandering.

■ The Court stated infra in Olson v. Board of Education that the point to be recognized in a case where all other educational factors are equal, is that the Board's action is based upon expert opin-

ion. The test for arbitrariness in relation to additional policies of New York is not necessarily the same as the test for arbitrariness in determining whether there has been a violation of the Fourteenth Amendment. The Court has no right to inject itself into the supervision of state schools unless there is a clear disregard of plaintiff's constitutional rights. Olson v. Board of Education of Union Free School District No. 12, Malverne, N.Y., 250 F.Supp. 1000, 1009–1010 (D.C.).

A definition of "desegregation" is contained in the Civil Rights Act of 1964, and is as follows:

"§ 2000c. *Definitions*

"As used in this subchapter—

\*   \*   \*   \*   \*   \*

"(b) 'Desegregation' means the assignment of students to public schools and within such schools without regard to their race, color, religion, or national origin, but 'desegregation' shall not mean the assignment of students to public schools in order to overcome racial imbalance." 42 U.S.C. § 2000c.

Plaintiffs rely upon the recent cases of Kelley v. Altheimer, Arkansas Public School District No. 22, 378 F.2d 483 (C.A. 8); United States v. Jefferson County Board of Education, 372 F.2d 836 (C.A. 5). These cases may be differentiated on the facts from the case under consideration here. Moreover, we are bound by the holdings in our own Circuit.

The principles laid down in the case of Deal v. Cincinnati Board of Education, supra, are applicable to our case.

Since the Knoxville School System is desegregated under the plan which has been in operation since the school year 1963–64 and since the preponderance of the evidence shows that the plan is not being operated to deprive Negro students of their constitutional rights and that Negro school teachers are not being discriminated against because of their race, it is, therefore, ORDERED that the various objections to the plan be, and same hereby are, denied and the motion for an injunction enjoining proposed school buildings in the Bearden and Fountain City area be, and same hereby is, denied.

This is not a case in which attorneys' fees are permissible. Fleischmann Distilling Corporation v. Maier Brewing Co. et al., opinion by Chief Justice Warren, decided May 8, 1967, and found in 87 S.Ct. 1404.

This case having been in this Court since 1959 and the Court being of the opinion as outlined above that the Board and school authorities are moving skilfully and with expedition toward the full integration of the Knoxville School System, that there is no further need for the schools to operate under Court supervision, it is further ordered that the case be stricken from the docket.