**Josephine GOSS et al., Plaintiffs-Appellants,**

v.

**BOARD OF EDUCATION, CITY OF KNOXVILLE, TENNESSEE, Defendant-Appellee.**

**No. 18165.**

United States Court of Appeals Sixth Circuit.

Feb. 10, 1969.

Avon N. Williams, Jr., Nashville, Tenn., Jack Greenberg, James M. Nabrit, III, Michael J. Henry, New York City, Carl A. Cowan, Knoxville, Tenn., Z. Alexander Looby, Nashville, Tenn., on brief, for appellants.

Sam F. Fowler, Jr., Knoxville, Tenn., S. Frank Fowler, Knoxville, Tenn., on brief; Fowler, Rowntree, Fowler & Robertson, Knoxville, Tenn., of counsel, for appellees.

Before WEICK, Chief Judge, O'SULLIVAN, Circuit Judge, and CECIL, Senior Circuit Judge.

O'SULLIVAN, Circuit Judge.

The District Court decision which we review, Goss v. Bd. of Education, 270 F. Supp. 903 (E.D.Tenn.1967), is the latest District Court consideration of the progress of desegregation of the schools of Knoxville, Tennessee. This lawsuit was started in 1959 when the school board of Knoxville was first ordered to desegregate its schools in obedience to Brown v. Bd. of Education, 347 U.S. 483, 74 S.Ct. 686, 98 L.Ed. 873 (1954). The plan first approved by the United States District Court for the Eastern District of Tennessee, Judge Robert L. Taylor, presiding, is set out in Goss v. Bd. of Education, 186 F.Supp. 559 (E.D.Tenn. 1960). Plaintiffs appealed to this Court from that decision and we modified and affirmed, Goss v. Bd. of Education, 301 F.2d 164 (6th Cir. 1962). The United States Supreme Court reversed us in Goss v. Board of Education, 373 U.S. 683, 83 S.Ct. 1405, 10 L.Ed.2d 632 (1963), because of its view that a transfer provision of the Knoxville plan, approved by us, would likely promote racial discrimination. The Supreme Court's mandate was implemented by this Court's order, 319 F.2d 857 (6th Cir. 1963), and in Goss v. Board of Education, 305 F.2d 523 (6th Cir. 1962), we approved with some modification a plan relating to the use of named high schools providing vocational and technical courses. A more detailed history of the relevant litigation is set out at length in Judge Taylor's opinion in the case now before us, 270 F. Supp. at 904–912.

After our remand in 1963—319 F.2d 857—and consequent further litigation, a plan to conform to the various orders of the District Court, this Court, and the Supreme Court, was submitted on August 6, 1965, as follows:

"1. Effective with the beginning of the school year in September, 1964, all racially discriminatory practices in all grades, programs and facilities of the Knoxville Public School System shall be eliminated and abolished. Without limiting the generality and effectiveness of the foregoing, all teachers,

principals and other school personnel shall be employed by defendants and assigned or re-assigned to schools on the basis of educational need and other academic considerations, and without regard to race or color of the persons to be assigned, and without regard to the race or color of the children attending the particular school or class within a school to which the person is to be assigned. No transfer or re-transfer of a teacher, principal or other school personnel may be granted or required for considerations based upon race and color and no assignment or reassignment of such teacher, principal or other school personnel may be made for considerations based upon race or color.

All tenure and seniority rights are to be observed and the defendants will not utilize or attempt to utilize the provisions of the State Teacher Tenure Law or any other law, custom or regulation conferring discretion upon them in the employment and discharge of teachers or the abolition of teaching positions in such manner as to discriminate either directly or indirectly on account of race or color in the employment, discharge, reemployment, assignment, or re-assignment of teachers, principals, or other school personnel in the Knoxville City School System.

2. Each student will be assigned to the school designated for the district in which he or she legally resides, subject to variations due to overcrowding and other transfers for cause, and the Superintendent may permit continued enrollment of students in their present schools until completion of the grade requirements for said school, provided this is consistent with sound school administrative policy.

3. A plan of school districting based upon the location and capacity (size) of school buildings and the latest enrollment studies will be followed subject to modifications from time to time as required.

4. Upon written application, students may be permitted to transfer to schools outside their assigned attendance zones only in exceptional cases for objective administrative reasons and no transfers shall be granted, denied or required because of race or color. All applications of students for transfer to schools outside their assigned attendance zones shall be considered and approved by the Superintendent of Schools pursuant to recommendation of the Director of the Department of Child Personnel after due investigation and consideration of the Department of Child Personnel.

5. Students may request transfer to or enrollment in any vocational or technical facility sponsored by the Knoxville City Board of Education and will be accepted subject to requirements respecting aptitude, ability, pretraining, physical condition, age, and other considerations including adequacy of facilities.

6. The Board of Education recognizes the continuation of jurisdiction of the United States District Court for the Eastern District of Tennessee, Northern Division, at Knoxville of this Board and the matters involved in this plan, until termination of said jurisdiction by express direction of said court."

Plaintiffs objected to several aspects of this plan and pretrial hearings were held and orders entered defining the issues for a planned hearing. A trial was scheduled for May 11, 1967 to consider plaintiffs' objections to the plan and on May 8, 1967 plaintiffs, in a pleading entitled Motion for Further Relief, gathered many objections to and attacks upon the school system of Knoxville. Judge Taylor's comprehensive opinion came down June 7, 1967. Presented to us upon plaintiffs' appeal are the following statements of questions involved:

## I.

Whether the Knoxville School System is completely desegregated in spite of the fact that the Negro schools under dual operation remain identifiable as

Negro schools and are attended almost exclusively by Negro students?

## II.

Whether the Knoxville School System should have been ordered to pair identifiable Negro schools which could be paired, locate new construction to help eliminate identifiable Negro schools, and take other affirmative action to disestablish segregation?

Preliminarily answering question I, it will be sufficient to say that the fact that there are in Knoxville some schools which are attended exclusively or predominantly by Negroes does not by itself establish that the defendant Board of Education is violating the constitutional rights of the school children of Knoxville. Deal v. Cincinnati Bd. of Education, 369 F.2d 55 (6th Cir. 1966), cert. denied, 389 U.S. 847, 88 S.Ct. 39, 19 L.Ed.2d 114 (1967); Mapp v. Bd. of Education, 373 F.2d 75, 78 (6th Cir. 1967). Neither does the fact that the faculties of some of the schools are exclusively Negro prove, by itself, violation of *Brown*. We think it helpful, also, to at once mention that of the total school population of Knoxville, only 15% are Negro children.

Aside from the general assertion that integration of the Knoxville schools is not moving with sufficient speed, plaintiffs make the following specific charges:

1. a so-called grade requirement transfer plan increases segregation.

2. a so-called brother-sister transfer plan increases segregation.

3. use should be made of the pairing of schools—the Princeton plan—to accomplish greater desegregation.

4. a building program under consideration—the building of some three additional and larger high schools—will perpetuate segregation or at least slow down desegregation.

Plaintiff's proofs consisted of statistical data and other information, principally gathered from answers to interrogatories submitted to defendants,[1] and the testimony of an expert, one Dr. Morris Osburn, who, while advising that he had never participated in the administration of school affairs or served on a school board, was currently acting as director of the Western Kentucky Human Relations Center for Education at Western Kentucky University in Bowling Green, Kentucky,[2] and had held that position since February, 1966. The trial of this case started May 11, 1967. In preparation for his testimony and findings he spent 24 to 30 hours in Knoxville—looking at its schools for 3½ to 4 hours one afternoon and spending an undefined amount of time examining the material obtained by plaintiffs' counsel through interrogatories and other means. Other than the above, he had no "personal familiarity with the school superintendent or staff, the school board, the teachers, the pupils, the community leaders or anything like that."

From his study, Dr. Osburn concluded that the school zone lines, drawn under a unitary neighborhood plan (where the lines are drawn to have children attend schools as close to their homes as geography and school capacity permit) did, in some cases, lead to perpetuation of segregation. He stated, relative to data before him, that in his opinion, "the effect is that segregation will be perpetuated * * * possibly a higher degree than is now being experienced." He found no evidence that Knoxville school authorities had drawn or allowed to remain any school zone lines with a purpose of fostering, tolerating or increasing segregation. He found no gerrymandering. Except for the specifics, which we discuss below, the direction of the professor's testimony was that the Knoxville school authorities should take affirma-

---

1. The evidence showed that it had cost the Knoxville school district approximately $50,000 to gather and put together the material with which to reply to plaintiffs' interrogatories.

2. The professor had served as a classroom teacher for three years in a small community south of St. Louis.

tive steps to bring about a better mixing of the Negro and white students.

He thought that in planning for new construction of three comprehensive high schools, to only one of which was the Board definitely committed, more consideration should be given to making them accessible to Negro students. The school superintendent testified in answer to this, giving the reasons that necessitated the new construction and its location and assuring that nothing in the school board's plans included a purpose to foster or perpetuate segregation.

Dr. Osburn further suggested a pairing of two elementary schools, one of which was primarily white and the other totally Negro. This would involve enlarging the attendance area to cover both school zones and sending all the children in selected grades to one school, and those in other grades to the other school. The Knoxville authorities expressed their own view that the safety of the children, the expense, and the possibility that one or both of these schools might be abandoned in the near future militated against the professor's suggestion. The evidence showed that the school board had tried pairing two high schools with disappointing results. Austin High School had been a Negro school and East High was white. Austin was desegregated for vocational instruction, East for academic courses, including college preparatory classes. Depending on the course he or she chose, a student could go to whichever school provided the desired courses. Notwithstanding this plan, there was, at the time of trial, only one white student at Austin.

The professor criticized the so-called grade requirement plan and the brother-sister transfer plan, both in force in the Knoxville schools. The grade requirement transfer program provided that if any student, white or Negro, were in attendance at a school outside his zone, he would be permitted to remain in such school until he had completed the grades available in such school. Attendance outside of the student's own zone could come about through the moving of the parents' residence or from earlier exercise by the student of the now-forbidden "freedom of choice" plan. Of this the District Judge said:

"Transfers under this plan amount to around six per cent of the entire student body of 37,220 students. The rule authorizes the Superintendent of Schools to continue enrollment of students in their present schools until completion of the grade requirement for said schools, providing this is consistent with sound administration. Those who testified on the subject stated that this was a rule that was very important in the administration of the schools. If the rule were changed, it would reduce the number of Negroes attending white schools according to Dr. Bedell.[3] The Negroes have been permitted to go to the school of their choice. The rule has not been used to promote segregation. It is not mandatory, but operates only upon the student's application. A student who is forced to leave the school he first chooses would sacrifice the beneficial association that he has made with his classmates, and would sever his connection with extra-curricular activities in which he has participated in that school such as football, basketball or baseball, Glee Club, dramatic club or band activity, or other valuable relationships which he has made." 270 F.Supp. at 912.

Another policy of the Knoxville schools condemned by the professor was the so-called brother-sister transfer plan which permitted a child to attend school in a zone other than in the place of his residence, where an older brother or sister was in attendance in such zone. Of this, the District Judge said:

"This Court can visualize instances in which both economic hardship and

---

3. Dr. Fred Bedell, Jr. at the time of hearing was the director of research and public personnel service of the Knoxville schools.

serious inconvenience would result if the younger child were not permitted to attend the same school which their older brothers and sisters attend. The proof shows that if this provision is eliminated, it will promote desegregation in some instances and in some instances it will not. The proof further shows that it is not operated to promote segregation but is operated for the benefit of the parents and students. The transfers under this provision involved around one percent of the students only." 270 F.Supp. at 913.

The school authorities gave evidence that such policy would not necessarily promote segregation. We are not impressed that the policy was used to promote or continue segregation; it could work both ways and was of minimal consequence. It was the judgment of Olin L. Adams, Jr., the Superintendent of Schools, that elimination of the policy would be more likely to promote segregation than not.

In answer to Judge Taylor's inquiry as to whether it was not proper to consider the parents' interest in the brother-sister plan, plaintiffs' witness, Professor Osburn, replied:

"We do have evidence of, there a great number of people right in the educational field, particularly in metropolitan areas and this fairly new project, that children do not identify with our neighborhood as we did when you and I were in school. However, we do have evidence and in projects, we found that the life experience and the range, geographic range of culturally disadvantaged children is far less than that of the middle class child so that the values produced in these less socio-economic areas transferred, transmitted more rapidly and over a longer period of time and more intensely if the value pattern is different and the behavior responses are different of these children, it seems to me, where they are getting an awful dose of it over a long period of time. We have got to get the child to where the edu-cation is going to do him the most good."

On the general subject of the progress of desegregation in the Knoxville schools, it is important to note that the Superintendent of Schools testified that any Negro can transfer out of a school in which his race is in the majority to a school attended by a majority of whites. This is in contrast to the freedom of choice or transfer plan condemned by the Supreme Court in Monroe v. Bd. of Commissioners, 391 U.S. 450, 88 S.Ct. 1700, 20 L.Ed.2d 733 (1968) and Green v. County School Bd., 391 U.S. 430, 88 S.Ct. 1689, 20 L.Ed.2d 716 (1968). Such testimony was not challenged and, while the practice would seem to violate the Knoxville school regulation that no transfer should "be granted, denied or required because of race or color," applications by Negroes to attend so-called white schools have been uniformly granted where there is available space in the white schools. It was shown that such availability was general.

We think that the District Judge may have inadvertently or otherwise, misstated the rule currently defining what are permissible transfers by the respective races in the public schools. He stated:

"The Court is of the opinion that a school district offends no constitutional requirements when it grants to all students uniformly *an unrestricted freedom of choice* (regardless of zoning) as to schools attended so that each pupil in effect assigns himself to the school he wishes to attend. Bradley v. School Board of City of Richmond, Va., 345 F.2d 310 (C.A.4); Wheeler v. Durham City Board of Education, 346 F.2d 768 (C.A.4); Goss v. Board of Education, 373 U.S. 683, 688–689, 83 S.Ct. 1405, 10 L.Ed.2d 632; Northcross v. Board of Education of City of Memphis, 333 F.2d 661, 665 (C.A.6)." 270 F.Supp. at 916–917. (Emphasis supplied.)

Such a conclusion might indeed have been then justified by the Supreme Court's observation that "we would have a dif-

ferent case here if the transfer provisions were unrestricted, allowing transfers to or from any school regardless of the race of the majority therein." Goss v. Board of Education, 373 U.S. at 689, 83 S.Ct. at 1409. But Green v. County School Bd., supra, and Monroe v. Bd. of Commissioners, supra, forbid such complete freedom of choice or transfer. The record in this case makes clear that not by rule, policy or forbearance can a white student, finding himself in a Knoxville school attended by a majority of Negroes, obtain a transfer to a predominantly white school because of racial considerations.

■ No purpose would be served by further recital and analysis of the evidence. We find no fault with Judge Taylor's view that segregation is neither furthered nor perpetuated by the Knoxville school authorities. We agree that quite substantial progress has been there made in serving the current goals of school desegregation. Judge Taylor obeyed the law of the Sixth Circuit as announced in Deal v. Cincinnati Bd. of Education, 369 F.2d 55 (6th Cir. 1966), cert. denied, 389 U.S. 847, 88 S.Ct. 39, 19 L.Ed.2d 114 (1967); Mapp v. Bd. of Education, 373 F.2d 75 (6th Cir. 1967) and Monroe v. Bd. of Commissioners, 380 F.2d 955 (6th Cir. 1967).[4]

■ These undisputed facts are illustrative of Knoxville's efforts to obey the commands of Brown v. Bd. of Education, 347 U.S. 483, 74 S.Ct. 686, 98 L.Ed. 873 (1954), and the later cases which have interpreted and implemented it. In 1960 Knoxville had a school system completely and de jure segregated, both as to students and faculty. At the beginning of the 1960–1961 school year, there were 22,600 students in the Knoxville schools of which 17,622 were white and 4,978 were Negroes. These figures remained about the same until the school year of 1963–1964 when, because of annexations to the school district, the school population increased to about 41,000, of which 36,000 were white and 5,000 were Negroes. In the last year covered by the testimony there were a total of 37,220 students of whom 31,605 were white and 5,615 were Negroes. During these years the number of white teachers had increased from 637 to 1,399 and the Negro teachers from 180 to 223. In the fall of 1960, there were 30 Negro children in mixed schools and in the fall of 1966 there were 4,641 Negroes attending biracial schools.[5] This would mean that 4,641 of 5,615 Negro students were going to school with whites. Until 1965 none of the schools had mixed staffs. By 1966, there were 35 of Knoxville's 64 schools with mixed teaching staffs. In 1960, 6% of the Negro students attended mixed schools; at the beginning of the 1966–1967 school year, 82.6% of Knoxville's Negro pupils were attending mixed schools. After the annexation in 1963 there were 43 schools with exclusively white attendance and by 1966–1967 this number dropped to 21.[6] In 1960–1961 there were ten schools with only Negro enrollment; by 1966–1967, this number had dropped to five. These figures are demonstrative of Knoxville's good faith and the effectiveness of integration in its schools. We do not believe it is for us or the District Judge to command a school district to adopt any particular plan for complying with relevant law so long as its school authorities are, in good faith, employing and implementing plans that are consistent with

4. Monroe v. Bd. of Education was reversed by the Supreme Court because there remained in the schools there involved the "free transfer" provision, which it condemned therein and in Green v. County School Bd., 391 U.S. 430, 88 S.Ct. 1689, 20 L.Ed.2d 716 (1968) and Raney v. Bd. of Education, 391 U.S. 443, 88 S.Ct. 1697, 20 L.Ed.2d 727 (1968).

5. The last figure includes several schools where there was only one or a relatively small number of Negroes mixed with white students, but also includes schools which contained substantially equal numbers of white and black students.

6. There is no contention that the exclusively white schools were the product of gerrymandering or other activities motivated to accomplish discrimination.

fulfilling their total duty to all the student body and at the same time making meaningful progress in the area of desegregation. In Green v. County School Bd., 391 U.S. at 439, 88 S.Ct. at 1695, the Supreme Court said:

"There is no universal answer to complex problems of desegregation; there is obviously no one plan that will do the job in every case. The matter must be assessed in light of the circumstances present and the options available in each instance. It is incumbent upon the school board to establish that its proposed plan promises meaningful and immediate progress toward disestablishing state-imposed segregation."

Unless Mr. Justice Brennan's language in Green, supra, that:

"School boards such as the respondent then operating state-compelled dual systems were nevertheless clearly charged with the affirmative duty to take whatever steps might be necessary to convert to a unitary system in which racial discrimination would be eliminated root and branch." 391 U.S. at 437–438, 88 S.Ct. at 1694.

means that somehow the Knoxville school authorities must proportionately spread its 15% Negro pupils among the 85% white school population, we consider that Knoxville is currently obeying the law. The District Judge described its progress as follows:

"The Court finds that after a slow start, the Board of Education and School Administration have moved with commendable zeal, conscientiousness and results toward the integration of the schools and faculties in an enormously complex situation. Knoxville is a town divided geographically on the south by a river with only three bridges across it, by a system of ridges on the north with a limited number of transportation routes therethrough, and by railroad systems quartering the town north and south, east and west, with multiple, hazardous grade crossings. The complexity has been heightened by the tendency of Negroes to live in two large, well-defined areas in the town rather than dispersed over it, by large urban renewal programs which displace portions of the population resulting in wholesale and unpredictable removals to other areas of the town, by the annexation of a large area of the County, since the beginning of this suit, whose students and schools have had to be absorbed into the City School System, by heavy increases in population necessitating a building program with crucial decisions as to building sites in the light of the geographical barriers and other factors involving population concentration and movements.

The Court finds that the above considerations are further complicated by serious budgetary limitations and fiscal complications, and by the fact that the Negro population itself constitutes but 15% of the whole, a fact, when figures alone are used, which tends to obscure what is actually a vigorous, straight-forward and expertly managed program of integration. * * "

We are persuaded that such conclusions were justified. The District Judge further observed:

"The Court is of the opinion that a school district offends no constitutional requirements when it grants to all students uniformly an unrestricted freedom of choice (regardless of zoning) as to schools attended so that each pupil in effect assigns himself to the school he wishes to attend. Bradley v. School Board of City of Richmond, Va., 345 F.2d 310 (C.A.4) Wheeler v. Durham City Board of Education, 346 F.2d 768 (C.A.4) ; Goss v. Board of Education, 373 U.S. 683, 688–689, 83 S.Ct. 1405, 10 L.Ed.2d 632; Northcross v. Board of Education of City of Memphis, 333 F.2d 661, 665 (C.A.6)" 270 F.Supp. at 916–917.

He cited the language found on page 689 of the Supreme Court's opinion in Goss v. Bd. of Education, 373 U.S. 683, 83 S. Ct. 1405, 10 L.Ed.2d 632 (1963), which indeed appears to support him, but in view of language of Green v. County

School Bd., 391 U.S. 430, 88 S.Ct. 1689, 20 L.Ed.2d 716 (1968); Raney v. Bd. of Education, 391 U.S. 443, 88 S.Ct. 1697, 20 L.Ed.2d 727 (1968) and Monroe v. Bd. of Commissioners, 391 U.S. 450, 88 S.Ct. 1700, 20 L.Ed.2d 733 (1968) we do not believe such broad freedom of choice would now satisfy the command of the Supreme Court. We do not, however, read the record in this case as indicating that there is such unrestricted freedom of choice currently being exercised in the Knoxville schools.

The District Judge believed that this case should now be stricken from the docket and said:

"This case having been in this Court since 1959 and the Court being of the opinion as outlined above that the Board and school authorities are moving skillfully and with expedition toward the full integration of the Knoxville School System, that there is no further need for the schools to operate under Court supervision, it is further ordered that the case be stricken from the docket." 270 F.Supp. at 918.

He expressed this understandable view on June 7, 1967, before the above cases in *Green, Raney* and *Monroe* were handed down by the Supreme Court in May of 1968. We read these cases to say that it would be best that each District Court keep this type of case alive on its docket until it can be said that the school district involved has accomplished what *Brown,* I and II, command. In *Raney,* the Court said:

"Finally, we hold that in the circumstances of this case, the District Court's dismissal of the complaint was an improper exercise of discretion. Dismissal will ordinarily be inconsistent with the responsibility imposed on the district courts by *Brown* II. 349 U.S. 294 at 299–301, 75 S.Ct. 753, 99 L.Ed. 1083. In light of the complexities inhering in the disestablishment of state-established segregated school systems, *Brown* II contemplated that the better course would be to retain jurisdiction until it is clear that disestablishment has been achieved." 391 U.S. at 449, 88 S.Ct. at 1700.

See also Kelley v. Altheimer, Ark., Public School Dist. No. 22, 378 F.2d 483, 489 (8th Cir. 1967), and Bd. of Education of Oklahoma City, Public Schools, Independent Dist. 89, Oklahoma County, Okl. v. Dowell, 375 F.2d 158, 168 (10th Cir. 1967). In *Green* the Court said school boards must adopt plans which "promise realistically to convert promptly to a system without a 'white' school and a 'Negro' school, but just schools." 391 U.S. at 442, 88 S.Ct. at 1696. The Court further said that it would be their duty "to convert to a unitary system in which racial discrimination would be eliminated root and branch." 391 U.S. at 437–438, 88 S.Ct. at 1694. We are not sure that we clearly understand the precise intendment of the phrase "a unitary system in which racial discrimination would be eliminated," but express our belief that Knoxville has a unitary system designed to eliminate racial discrimination. In Monroe v. Bd. of Commissioners, 380 F.2d 955, 958 (6th Cir. 1967), we expressed our view that the end product of obedience to Brown I and II need not be different in the southern states, where there had been *de jure* segregation, from that in northern states in which *de facto* discrimination was a fortuity. Our observations in that regard were not found invalid by the Supreme Court's opinion reversing our Monroe decision. See Monroe v. Board of Commissioners, 391 U.S. 450, 88 S.Ct. 1700, 20 L.Ed.2d 733 (1968).

In the time ahead, and consistent with its need and duty to serve without discrimination its entire school population, the Knoxville Board of Education may wish to consider some pairing of existing schools and some alterations of its plans for future construction. We make no commands in this regard.

■ We must, therefore, direct the District Judge to keep this case open upon his docket. Otherwise, the judgment of the District Court is affirmed.