Josephine GOSS et al.

v.

**BOARD OF EDUCATION, CITY OF KNOXVILLE, TENNESSEE, et al.**

Civ. A. No. 3984.

United States District Court,
E. D. Tennessee, N. D.

July 1, 1970.

Carl A. Cowan, Knoxville, Tenn., Avon N. Williams, Jr., Nashville, Tenn., Jack Greenberg, New York City, for plaintiffs.

S. Frank Fowler, Knoxville, Tenn., for defendants.

## MEMORANDUM

ROBERT L. TAYLOR, District Judge.

██ Plaintiffs seek to dismantle the Knoxville school system and to substitute therefor what they refer to as a unitary system. A unitary school system is one "within which no person is to be effectively excluded from any school because of race or color." Alexander v. Board of Education, 396 U.S. 19, 20, 90 S.Ct. 29, 30, 24 L.Ed.2d 19; Northcross v. Board of Education, 397 U.S. 232, 237, 90 S.Ct. 891, 25 L.Ed.2d 246 (1970), (concurring opinion).

This litigation has a long history.[1] In its present posture, the suit involves a motion by plaintiffs filed November 17, 1969, shortly after the decision in Alexander v. Board of Education, supra, for immediate relief. Preliminary proceedings[2] resulted in an order limiting proof on the merits to specifically alleged discriminatory developments since the last decision in the suit on June 7, 1967. These developments concerned the alleged gerrymandering of neighborhood school zone, faculty employment policies, and the policies governing the location of new educational facilities.[3]

When this suit was instituted on December 11, 1959, the Board of Education had maintained de jure segregation in the schools since 1870. After the mandate in Brown v. Board of Education, 347 U.S. 483, 74 S.Ct. 686, 98 L.Ed. 873 (1954), 349 U.S. 294, 75 S.Ct. 753, 99 L.Ed. 1083 (1955), the Board had considered some eight plans of integration, without judicial proceedings, but none was adopted. The 1959 plan proposed to the Court was a grade-a-year-plan. One feature of Plan 9 was:

"4. A plan of school zoning or districting based upon the location and capacity (size) of school buildings and the latest enrollment studies without reference to race will be established for the administration of the first grade and other grades as hereafter desegregated."

These zones were discussed in the Court's 1960 memorandum.

"In implementation of the Plan filed on April 8, 1960, the Superintendent testified that he instructed his Staff to begin work on a zoning map which was approved at a meeting of the Board on August 6, 1960, just two days before the hearings began. He testified that he instructed his Staff that in the preparation of the map there would be no maneuvering or gerrymandering, that the rezoning and re-establishing of school zones must be based on enrollment studies and on the size and capacity of the buildings. The work was in charge of

1. The report at 270 F.Supp. 903 (D.C. 1967) traces the history of the suit and the history of desegregation in the schools. Memorandums styled Goss v. Board of Education are also reported at 186 F.Supp. 559 (D.C.1960); 301 F.2d 164 (6 Cir. 1962), 305 F.2d 523 (6 Cir. 1962), 373 U.S. 683, 83 S.Ct. 1405, 10 L.Ed.2d 632 (1963) and 406 F.2d 1183 (6 Cir. 1969).

2. A hearing on December 12, 1969 was postponed due to a commitment of plaintiffs' counsel. Defendant filed a motion to dismiss January 30, 1970. All motions were heard on March 16, 1970, and an order entered April 3, 1970 limited the scope of the proof on the merits.

3. Proof was heard April 21, 1970, and the parties were ultimately granted 50 days to file briefs.

Mr. Frank Marable, Supervisor of Child Personnel, whose duty it is to check on attendance, school zones and the movement of people.

"On cross-examination, he testified that in preparing the map, efforts were made through the pre-school round-up program and estimates of principals to get estimates of the number of children that would be affected. This zoning plan was confined to the elementary schools and did not include the secondary schools.

"Under detailed cross-examination, Mr. Johnston pointed out that small groups or pockets of Negro homes were scattered throughout the Knoxville City School System in contrast to major concentrations of Negro citizens; that the zone boundaries were often dictated by artificial barriers like heavily traveled streets and also by the size and capacities of school buildings.

\* \* \* \* \* \*

"He testified categorically that no member of his Staff in working on the map had ever operated deliberately to cut out Negro children; and that they tried to work the thing out on a fair basis, depending on the size of the building, shifting population and enrollment."

On appeal the zones were approved by the Court of Appeals, 301 F.2d 164 (6 Cir. 1962), and the Supreme Court did not grant certiorari on this issue. 371 U.S. 811, 83 S.Ct. 38, 9 L.Ed.2d 53 (1962).

In 1967, this Court stated:

"This brings us to a third issue, namely, whether the Board has operated the plan as modified to promote segregation in violation of the Fourteenth Amendment.

"The items which plaintiffs raised under this issue were many. They contended that the zone lines were made to promote segregation. These lines were in the plans that were approved by this Court and were reviewed by the Sixth Circuit on at least two appeals and presumably were either not attacked or were impliedly approved by the Supreme Court of the United States when it considered and remanded the case to the Court of Appeals by holding that the transfer plan involving the minority-majority rule was unconstitutional. This day is late for making a claim that the zones are unconstitutional because they promote segregation.

"The Knoxville School System is known as the neighborhood system. The neighborhood school has been approved by various courts, including our own Circuit.

"The great and convincing preponderance of the proof shows that the zones were not made to promote segregation. The effect of the testimony of Dr. Osborne was that the zones were not intentionally gerrymandered, but that in many instances they promoted segregation.

"Doctor Adams stated that the zone lines were designed to fill school buildings \* \* \*"

The evidence presented at past hearings showed, and the Court finds, that there was no gerrymandering of the zones before 1967. The Board has continued to use the same criteria in establishing zones since 1967. In answers to interrogatories, it stated:

"The major criteria used in drawing up boundaries for school zones [are]:

"(1) Capacity of existing school structure;

"(2) Existing safety hazards in immediate area;

"(3) Physical proximity of students to the school (neighborhood school)."

The Board admitted that zones were reviewed annually and that changes had been made since 1967. Consequently, the Court heard proof to determine if the Board had continued to follow its approved policy.

Doctor Fred Bedelle, Jr., the Assistant Superintendent in Charge of Personnel

and Development, was the defendant's only witness. An employee of the defendant since 1963, he recruits and assigns teachers and is in charge of pupil services and assignments. Initially, he explained changes in the elementary schools.[4] There was a one block change in the Chilhowee zone in 1967 when a new road was opened. This had no effect on the racial composition of the school in 1967. Chilhowee had 721 white students in 1967. In 1969, 640 white and 42 Negro students attended that school.

In 1967, adjustments were made in the Belle Morris, Brownlow and Mc-Callie zones. Land condemnation for Interstate 40 had eliminated some residential housing, and the changes compensated for classroom vacancies. Dr. Bedelle testified that some 80 pupils were involved and that there was some change in the racial composition of the schools involved because the housing in these areas was integrated.

The Beaumont zone was moved one block north on the north side to eliminate overcrowding at Lonsdale, the adjacent zone, and to avoid traffic hazard from an access route to I-75.

In South Knoxville a change in the high school pupil assignment was responsible for some elementary school shifting in 1968. Certain students from Young High, a city school with grades 9–12, were shifted to Doyle High, a newly constructed county school. Some Young students were shifted to South High. To utilize vacant space at Young, it was changed into a 7–12 grade school. Grammar schools in the area which were formerly 1–8 were converted into 1–6 systems. Three and four block adjustments in the Galbraith, Giffin and Flenniken zones were made to balance classroom capabilities. The grammar school zone changes involved less than 75 students and had no effect on the racial

composition of the student bodies because the schools, reflecting residential housing, are almost exclusively attended by white children. In 1969, eight of the 1018 children who attended these schools were Negro. Similarly, the changes in Young High had no effect upon the racial composition of the student bodies involved.

Doctor Bedelle stated that all elementary school zoning changes involved between 200–250 students and had "very little effect" upon the racial mixture of those schools.

As the previous discussion concerning Young High implies, there were more significant changes in secondary school zones. The opening of new schools was mainly responsible for the changes. Northwest Junior High (7–9) opened in the Fall of 1968. Ridgedale, Pleasant Ridge, West Haven, and Norwood were changed from 1–8 into 1–6 systems. Seventh and eighth grade students from those schools, some ninth graders who had attended Central High, and some county students formerly assigned to Powell High made up the Northwest student body. In 1969, two of the 999 students were Negro. The student body reflects the composition of the residential housing in the area. Zone changes did not affect integration.

Bearden Senior High (10–12) opened in the Fall of 1969. The Former Bearden campus had contained a 1–8 and a 9–12 system. The former campus was changed into a K–6 and a 7–9 system. Cedar Grove and West Hills Elementary were changed from 1–8 into 1–6. Those seventh and eighth graders were assigned to Bearden Junior High. The Bearden zone was contracted and straightened on the north and east sides. These zone adjustments and the opening of the new Bearden school relieved pressure caused by overcrowding at all these

4. Apparently, Knoxville schools are organized or are being organized into a 6–3–3 system, but significant deviations exist. Although the Court recalls no testimony on the issue, defendant asserts, and the interrogatories support that as-

sertion, that before the 1963 annexation city schools were in a 6–3–3 grade system. Annexed county schools used the 8–4 system. The 8–4 schools are being phased out as new schools are built.

schools and allowed removal of some temporary classrooms. There was no effect on racial composition of schools in the involved zones since changes were made in areas involving near exclusive white residential patterns.

A slight change was made in the West High zone on the west side to adjust the zone for irregularities created by the old city boundary of Knoxville.[5] West changed from a 9–12 to 10–12 in 1968 when Northwest Junior High was opened. In 1967, 1968 and 1969, 39, 26 and 32 Negroes, respectively, attended West.

There was a 1967 adjustment of the zone between Whittle Springs Junior High and Park Junior High. The Park zone was increased on the north to include areas that were formerly in the Whittle Springs zone. Dr. Bedelle explained that the change relieved overcrowding at Whittle Springs and added students at Park where existing facilities were not being fully utilized. There is no numerical evidence before the Court of the racial composition of these two schools in 1966 before the change occurred.

Austin High was the Negro high school under de jure segregation. Currently Austin offers extensive vocational courses while academic courses for this area are taught at East High. In 1968, zone lines between the two schools were abolished. The particular curriculum chosen by the student determines where he attends. There are shuttle buses for necessary class interchanges. In 1967, before abolishing the zone lines, Austin (10–12) was attended by one white and 442 Negroes; East (9–12) had 294 whites and 342 Negroes. In 1969, ten whites and 739 Negroes attended the combined schools.

On cross-examination, plaintiffs vigorously attempted to develop the idea that not changing the boundary lines would also produce gerrymandering. Under this theory, evidence was heard which attacked the validity of zones approved in the past and most of the other facets of pupil assignments. Special emphasis was given to Rule High and the feeder schools in that area. Rule is a 7–12 system with a 1200 capacity. In 1967, 1264 whites and 142 Negroes (206 overcapacity) attended there; in 1968, 1172 whites and 173 Negroes (145 overcapacity) attended; and in 1969, 1120 whites and 244 Negroes (164 overcapacity) attended. Nearby, Beardsley Junior has grades 7–10 and a 750 capacity. It is the only school in Knoxville with this grade structure. In 1967 of 498 pupils, 11 were white; in 1968 four of 416 were white; and in 1969 four of 361 were white. Plaintiffs contend that failure to adjust these zones lines to fill the Beardsley vacancies shows that the present lines perpetuate segregation. Dr. Bedelle stated that there had been staff studies of the area, but that he was not sure what recommendations had been made. He stated that 6–8 portable classrooms would be necessary for Beardsley to accommodate all of the students in 7–9 grades in this area. He did not state what impact this change would have on Rule.

Doctor Bedelle testified that the Board had not considered pairing any schools. Plaintiffs pointed out from data taken from interrogatories that if existing racial patterns were maintained, pairing would produce an almost equal number of white and Negro students in certain schools. Lonsdale and Sam E. Hill are two of the schools plaintiffs mentioned. These schools are not far apart and have grades 1–6. Lonsdale has a capacity of 560 and 48 of the 423 students are Negroes. Sam E. Hill, a former all-black school, has a capacity of 540 and four of the 351 students are white. West View and Cansler are similar but defendant maintains that the railroad and major traffic artery dividing the section makes pairing dangerous.

Plaintiffs also contend that the Park Junior and Vine Junior zones tend to promote segregation because Magnolia

---

5. In 1963, Knoxville annexed considerable adjacent property.

Street, the four-lane highway that divides the two zones, has a black residential pattern to the south and a white pattern to the north. In 1969 of 633 students at Vine, five were white. At Park 235 were white and 274 were Negroes. In this connection, Dr. Bedelle stated, in effect, that the mixing or non-mixing of races was not the most important factor in locating a zone's boundary. In this particular instance he felt that locating the boundary line on this major traffic artery was consistent with all the past experience of the Board.

Plaintiffs' proof, in addition to the interrogatories, consisted of testimony of Dr. John H. Croghan, an Assistant Professor of Education at The University of Miami. His principal classroom duties consist of instructing potential principals in administration. Many of his duties as a professor involve the establishment and implementation of school integration plans.[6] The Court understands he has authored or participated in drawing plans involving 17 Florida counties. The Defense Fund [7] employed him to testify in Knoxville. In answering a series of questions eliciting his familiarity with the Knoxville schools, he stated that he had studied defendant's responses to the interrogatories for three days. The hearing was the occasion for his third trip, each of two days duration, to Knoxville. In attempting "to get a feel of the school system" he had examined one-half of the school buildings, at least to the extent of driving past them in an automobile. He had talked with one member of the Board and with other assistant superintendents, principals, teachers, guidance counselors, and community leaders, especially in the black community.

In defining the terms he used, he stated that "effective desegregation" existed when no school could be racially identified by the composition of the students or faculty. In other words, since 16% of the students under defendant's control are Negroes, then 16% of each student body should be composed of Negroes. Under this definition there is no effective desegregation in the Knoxville schools. Dr. Croghan introduced Exhibit 12 which shows that 83% of the Negro students in Knoxville attend schools that have student bodies composed of over 50% Negroes. Almost seventy-eight percent of the Negro teachers teach at schools where over 50% of the student body are Negro.

Doctor Croghan made general observations about the Board's policy. On gerrymandering, he expressed surprise over the Board's failure to maintain a "pupil locator map." The Court understands that such a map would fix all the residences in Knoxville and show the race, number and age of pupils residing therein. Without such a map the witness stated that definite conclusions about gerrymandering were difficult to make. There are possible changes in zones which will alter existing racial composition at schools. For example, boundary lines for the Austin-East feeder schools could be redrawn.

Other factors which would also change the racial composition but leave it short of the desired 16% were mentioned. If certain elementary feeder schools were changed, racial composition at secondary schools would change. One hundred eleven of the 122 portable and temporary classrooms used by defendant were located at schools where the student body was generally white. Dr. Croghan felt that expanding capacity at these schools while leaving existing capacity at some predominately Negro schools under-utilized, showed an intent by the Board to perpetuate segregation. His

6. The federal government pays one-half of Dr. Croghan's salary. He is a "Title IV" employee under subchapter IV of the 1964 Civil Rights Act dealing with "Public Education." 42 U.S.C. § 2000c et seq.

7. See N.A.A.C.P. v. Button, 371 U.S. 415, 83 S.Ct. 328, 9 L.Ed.2d 405 (1963) for organizational heirarcy.

remedy was to enlarge the zones at schools with available space. In this respect, he also mentioned that the grade structure at Beardsley (7–10) was forced in order to hamper integration. It was his further opinion that the existence of special course offerings at various schools promoted segregation. He was especially critical of the variation in curriculum at Fulton High (1,213 white—115 Negro—1969) and Austin-East (10 whites—739 Negro—1969), the vocational schools that defendant operates.

The trust of all of plaintiffs' contentions is that if any school in the system can be identified by race, then a dual system exists. Applied to Knoxville, it is asserted that this situation can be remedied by assigning 84% white students and 16% black students at all schools. In a closely related proposition, plaintiffs assert that the goal of all the Board's actions in the pupil assignment area should be to mix more students racially. Specifically, plaintiffs say that failure to establish zone lines that would achieve a higher percentage of racial mixing is improper. Plaintiffs contend that portable classrooms are used at predominately white schools to absorb student overloads instead of adjusting zones to assign these students at predominately black schools where the necessary facilities exist. Plaintiffs also contend that the Board should pair schools to achieve more racial mixing; that the transfer system is unconstitutional especially with the demonstrated result at Austin-East; and that the feeder school system is operated in a discriminatory way to prevent or retard racial mixing. (None of the last four contentions was made in the initial motion for immediate relief.)

The Board's position is that it was maintaining a consitutitionally acceptable policy in 1967 when this Court approved its policy and that it has continued its operations under that plan which was later affirmed by the Circuit Court. It denies assigning any students to perpetuate segregation.

In approving the Board's plans in 1967, this Court dismissed the suit because it was of the opinion that the schools in Knoxville were racially desegregated. Plaintiffs have urged in these proceedings that the effect of later decisions, especially *Alexander*, supra, is that if any school is racially identifiable, then the system is not desegregated. There appear to be racially identifiable schools under the Board's control due to the housing patterns of the neighborhoods.

■ Fundamental to the legal questions raised by the recited facts is the constitutionality of neighborhood schools. Plaintiffs' overriding contention is that the neighborhood schools violate the Fourteenth Amendment. In the opinion of the Court, neighborhood schools are constitutionally sound. The *Brown* mandate, supra, as applied by this Court in 1967, Goss v. Board of Education, 270 F.Supp. 903, and as modified by the 1968 school cases, Green v. County School Board of New Kent County, 391 U.S. 430, 88 S.Ct. 1689, 20 L.Ed. 2d 716; Raney v. Board of Education of Gould School District, 391 U.S. 443, 88 S.Ct. 1697, 20 L.Ed.2d 727; Monroe v. Board of Commissioners of City of Jackson, 391 U.S. 450, 88 S.Ct. 1700, 20 L. Ed.2d 733, and *Alexander,* supra, in 1969, and *Northcross,* supra, in 1970, has not abolished the neighborhood school. See *Northcross,* supra, especially the concurring opinion of Mr. Chief Justice Burger. The Sixth Circuit approved of neighborhood schools when it reviewed this case in 1969, Goss v. Board of Education, 406 F.2d 1183, and has more recently reiterated its position in a case dealing with the Cincinnati schools. Deal v. Cincinnati Board of Education, 419 F.2d 1387 (December 9, 1969). That opinion, which this Court must follow, stated:

"In our opinion in the first appeal, we said:

"'The neighborhood system is in wide use throughout the nation and has been for many years the basis of school administration. This is so

because it is acknowledged to have several valuable aspects which are an aid to education, such as minimization of safety hazards to children in reaching school, economy of cost in reducing transportation needs, ease of pupil placement and administration through the use of neutral, easily determined standards, and better home-school communication.' (369 F.2d [55] at 60)

"Appellants contend that housing patterns in Cincinnati are segregated as a result of actions of both public and private agencies, and that the School Board 'may not close its eyes to this reality' but should remedy it. We are not told how or by what lawful authority the School Board can remedy the housing patterns of a neighborhood. Perhaps what appellants want is for the Court to order the Board to provide buses to transport children to other school districts where they do not reside, construct additional schools in such other districts where necessary to accomplish this purpose, and abandon the existing neighborhood schools. We find no basis to enter any such order.

 * * * * * *

"Boards of Education can hardly be blamed or held responsible for neighborhood residential patterns.

"In our opinion, the burden of righting wrongs alleged to have been committed by public or private agencies ought not to be foisted upon Boards of Education, which have enough problems of their own to solve in providing proper education for the young. Nor should such burden be saddled upon the owners of real property who are taxed in Ohio to provide funds for the operation of public schools * * *'" 419 F.2d pp. 1391, 1392

■ There is no evidence in the record that the Board has made changes for racial reasons. The contention that the Board has an affirmative duty to change the zones to increase racial mixing is not well founded.

■ In a related area plaintiffs spend considerable time developing the facts about the Rule and Beardsley areas. The Court finds that in the areas served by Rule and Beardsley the Board has not acted in accord with its stated policy of drawing zone lines to conform to the capacity of existing school structures. In 1969, the 1200 capacity Rule School was attended by 1364 students. Beardsley with a 750 capacity was attended by 361 students. The Board has asserted in supplemental proposed findings of fact that the calculations found in the answers to interrogatories concerning school capacity were mechanically determined by multiplying the number of classrooms by the number of students who can utilize a typical classroom. Since all classrooms are not uniform, it is asserted that the given school capacities may be erroneous. The Court accepts this contention to a limited degree because there was no allegation concerning classroom utilization and the Board was not prepared to present other than general data on the subject. Acceptance of the Board's contention does not entirely explain the disparity in these zones which has sharpened since 1967. Accordingly, the Board is directed to revise the zones in this area for the 1970 school term to eliminate overcrowding at Rule and to utilize existing capacity at Beardsley. This revision may or may not continue the present grade structure at Beardsley.

In view of the foregoing direction, during its annual revision of zone lines, the Board may wish to pay considerable attention to the 1,000 capacity Holston High where attendance has increased from 1,093 in 1967 to 1,289 in 1969.

■ The controversy concerning the use of portable classrooms was developed at trial. There was no allegation of their use to perpetuate segregation and the Board offered no proof on the subject except for the statistical data supplied in answers to interrogatories.

The Court understands that portables are used as a temporary expedient in neighborhoods which are so overcrowded that construction of additional facilities is projected by the Board. For instance, the Board reacted to the westward population shift by constructing Bearden Senior High. In the interim period "portables" were used. At the Bearden complex, West Hills, and Norwood, 32, 26 and 19 portable classrooms were used respectively in 1967, 1968, and 1969. In 1969, the Board used a total of 48 portable classrooms. The Court observes that the zones where portables were used were not contiguous to zones with unusual unutilized capacity. Exhibits before the Court show capacity which is assumed to be the maximum capacity as opposed to the optimum capacity. Exhibits also show some unutilized space at many of the schools in the system. The use of portable classrooms is a decision within the Board's administrative expertise, and the evidence does not show that "portables" were used in violation of plaintiffs' rights under the Fourteenth Amendment.

 The Board asserts that the junior and senior high schools depend upon a feeder system for enrollment. Plaintiffs say that the feeder system does not promote desegregation.[8] The evidence is insufficient to support this contention.

The transfer policy has been the subject of much controversy during prior litigation. The Board presently allows transfers for the following reasons:

1. Continued enrollment of students in their present schools until completion of the grade requirements of said school.

2. Hardship imposed upon parent(s) and/or child.

3. Availability of vocational offering approved for the student.

4. Educational program level (accelerated, average, slow learners, SMR) as recommended by the Assistant Superintendent for Instruction.

5. Capacity of the school plant or availability of classroom space.

6. Medical or physical handicap.

7. Emotional difficulty in adjusting to a specific school situation.

8. Administrative reassignment due to disciplinary action.

Plaintiffs have asserted that this policy is used to perpetuate segregation in the Knoxville schools. Pointing to the facts concerning the Austin-East zone, plaintiffs say that the Board has allowed informal transfers at will. From the facts recited in the Order of May 12, 1970, it appears that there is some irregularity in the administration of that policy. Transfer irregularities were not alleged, and the defendant did not submit evidence of the number of students who attend schools out of zone and the reasons therefor. Plaintiffs asked for this information in their initial interrogatories, and the Board has never supplied an answer. Parenthetically, the Court was not aware of this fact when it ruled upon post-trial objections to interrogatories seeking similar information. In light of the former history of this suit the Board has committed a grave omission in failing to either enforce its transfer policy or to maintain records to show that enforcement. Failure to provide the requested information is difficult to excuse. Approval of neighborhood zones is specious when informal transfers occur. For this reason the Board is ordered to keep adequate records to show enforcement of its

8. In examining proposed findings submitted by the parties, the Court sees that some confusion has developed on this point. Beardsley Junior High is cited as an example of a bad feeder system. Exhibit IX answering Interrogatory 18 omitted the feeder systems for Beardsley and Bearden Junior Highs. Map exhibits show that Rocky Hill and West Hills feed into Bearden. Beardsley is fed by Cansler, Maynard, and Moses Schools.

transfer plan and to allow plaintiffs to inspect such records at reasonable times.

Plaintiffs alleged that the Board had continued segregation and racial discrimination in the assignment, hiring and discharge of principals and faculty. Exhibit IV to interrogatory 9 shows that the Board employs nine Negro and 59 white principals.[9] Dr. Bedelle explained that his staff was responsible for the screening of principal applications. Among other things a state certification is necessary for qualification. He expressed his opinion that any competent principal regardless of race could administer an integrated school. After the preliminary screening the Board, an elected body, actually selected the principals. Dr. Bedelle did not know what motivated their choice. In this connection, it was shown that the Board's membership had been enlarged from five to nine in 1969 and that a Negro lady was a member of the Board.

Doctor Bedelle testified that no principal had been transferred solely for racial reasons. In 1969, a Negro replaced a white principal at Park Junior High (274 Negroes—234 whites—1969). During the consolidation of Austin and East, the Negro principal at Austin became coordinator of federal projects. A younger white principal was transferred from Christenberry Junior High to head the combined schools.

In 1969, the Board employed 1429 white and 229 Negro teachers. Thirteen percent of the 1969 teachers were Negroes while 16% of the students were Negroes. Dr. Bedelle stated that integrated faculties were beneficial. While he testified that the Board was making a concerted effort to hire qualified Negro teachers, only four of the 39 new teachers hired in 1969 were Negroes. In explanation he stated that the Board had received a disproportionate number of qualified applicants from prospective white teachers.

Assignments of teachers are closely related to hiring. Teachers are hired with the intent to put them in specific vacancies. Vacancies may arise when a teacher leaves the system, requests reassignment (transfer) or when a school is expanded to require a new teacher. Vacancies are filled to achieve a biracial mix in a school's faculty, but no assignments were made solely for this purpose. Many factors are significant in assignments. A teacher's request for assignment or reassignment is granted when possible to maintain employee morale. A conflicting policy is the Board's desire to retain teachers at the same school, especially at elementary schools. The theory behind the policy is that teacher continuity facilitates community interest and aids the parent-teacher relation. It was also pointed out that elementary teachers were easier to assign than secondary school instructors because their job skills were less specialized. In addition to academic qualifications and state licensing requirements, Dr. Bedelle stated that a certain factor, intangible to some extent, guided hiring and assignments. The strengths and weaknesses of various departments of a faculty and personality cohesiveness among existing and potential faculty members are considered. These factors, he felt, explained why there were no transfers solely on account of race. Furthermore,

9. EXH. IV names 68 principals. For statistical purposes the Court has had some difficulty in determining how many schools are controlled by the Board. In an affidavit filed February 17, 1970, attached to a brief, plaintiffs' attorney deposes there are 65 schools. In EXH, I to interrogatory 1, defendant has listed 70 schools. Among these are Elmwood which the Court understands is consolidated with Beaumont and has no principal. Also included among these 70 are Juvenile Home, Knoxville Adult Center, Knoxville Evening High and the State Area Vocational Tech. The Court will treat the system as having 65 schools, eliminating Elmwood (its figures are consolidated with Beaumont), Knoxville Evening High, the Adult Center, the State Area Vocational Tech, and Juvenile Home. Student composition at these schools apparently is not determined by racial considerations.

it was his opinion that a summary transfer solely for racial reasons would adversely affect teacher morale and job performance.

Doctor Croghan was critical of the Board's policy of maintaining consistency in faculties which serve neighborhood schools. Any advantage of faculty continuity in its present character is neutralized by the adverse effect of racial imbalance. A pre-service orientation can condition teachers to work effectively in neighborhoods with which the teachers are unfamiliar. Dr. Croghan had participated in a human relations orientation of this nature which only took three weeks to conduct in Dade County, Florida. In concluding this line of testimony he introduced Exhibits 16 and 17 which show that by reassigning 136 elementary and 116 secondary teachers, defendant's faculties could be balanced in a racial sense, i. e., 13% Negro instructors at all schools.

The Board first integrated its faculties in 1965. The number of integrated staffs has risen steadily; there were 11 in 1965, 35 in 1966, 37 in 1967, 41 in 1968 and 44 in 1969. Plaintiffs contend that black teachers, who are 13% of the teachers employed by the Board, should be assigned to avoid having schools identified by the race of the faculty. Plaintiffs also contend that assigning black principals only at predominately black schools is also improper. In the alternative, plaintiffs say that the present pace of faculty integration is too slow and in reality represents only token integration. The Court finds that since the 1965 decision in Bradley v. School Board of City of Richmond, 382 U.S. 103, 86 S.Ct. 224, 15 L.Ed.2d 187, the Board has made a good faith effort to integrate faculties. Dr. Bedelle, who was in charge of faculty assignments, stated unequivocally that integrated faculties were beneficial. The effect of his testimony was that the Board recognized its duty to integrate, and while not actually ordering a teacher to transfer for racial reasons, encouraged transfers that resulted in faculty integration and exercised some

discretion to achieve that result. The Court finds that the Board is fulfilling its duty in the integration of teachers in the Knoxville system. Shifting of professional employees cannot be done like the moving of furniture. In that context, it is observed that 109 of the 252 teachers to be reassigned under plaintiffs' plan to achieve racial equality are black. This movement of almost 50% of the black teachers employed by the Board would result in a very large turnover of suspected disruptive proportions in schools where the percentage of black teachers is great.

In view of *Alexander*, the Court is constrained to find that the Board should accelerate the integration of faculties. At the same time, it is observed that no opinion has clearly defined the extent of this duty. See United States v. Montgomery County Board of Education, 395 U.S. 225, 89 S.Ct. 1670, 23 L. Ed.2d 263 (1969). The Board is reminded that the choice of the teacher does not have much weight in this area. Monroe v. Board of Commissioners, 380 F.2d 955, 960 (C.A.6, 1967). As a further guideline the Board should note the language ordering a school board to "employ, promote, and assign faculty and other personnel 'in furtherance of a goal of removing the former racial identity of a school.'" Monroe v. Board of Commissioners, 427 F.2d 1005 (C.A.6, June 19, 1970).

The Court finds that the evidence is insufficient to support charges of discrimination in the hiring and discharge of teachers or principals. The Court further finds that the Board has not discriminated in the assignment of principals. In consideration of the magnitude of principals' duties, the Board should have considerable latitude in assigning principals. There are no black principals at predominately white schools. A black principal did replace a white principal at Park School (274 black—234 white—1969). A white principal also replaced a black principal at the combined Austin-East School. There is no evidence to show that the

Board abused its discretion in the assignment of principals.

Plaintiffs alleged that the defendant was perpetrating a racially segregated school system by locating new schools or adding to existing schools in residential neighborhoods which were predominately white or black, thereby creating racially identifiable schools. Proof on this issue was limited to schools which were not in the planning or construction stage on June 7, 1967 since a prior decision was made on the same issue adversely to plaintiffs' contention. Goss v. Board of Education, 6 Cir., 406 F.2d 1183, 1186. Answers to interrogatories show that only four schools have been expanded or plans begun for expansion since 1967. New construction at one of those four schools, Bearden Junior High, was limited to the renovation of two shops before the 1969 term. The $31,000.00 cost is considered de minimus. Expenditures had been made on other schools, but these expenditures were considered to be in the form of normal operating costs rather than expanding existing capacity. For instance, "heating corrections" at Park Junior High were completed between 1964 and 1969 at a cost of $43,-800.00.

Planning was begun in September, 1969, to build an elementary school (1–6) with a 600 student capacity in East Knoxville. The location of the school has not been fixed, but the Board has three sites under consideration at present. The Court understands the testimony to be that the location will be east of a North-South line drawn between Fair Garden and Robert Huff schools.

Several reasons were given in support of the proposed locations. Immediately east of the downtown commercial center and north of the Tennessee River, an extensive urban renewal project has been conducted in the past several years. The effected area was in one of the two major localities where Negroes reside in Knoxville. Much residential housing was razed, forcing a population shift. In contrast to white patterns, Negro shifts radiated eastward from the downtown area with Magnolia Avenue being generally maintained as a northern boundary of the Negro community.

This forced population shift has disrupted traditional attendance patterns in nearby neighborhood school zones. For example, Green School (1–6) with a 750 student capacity is now near no residential population center. Attendance tapered from 469 in 1967 (23 white) to 365 in 1968 (8 white) to 281 in 1969 (5 white). Resources at schools in adjacent neighborhood zones have become burdened. So much overcrowding developed at Eastport that the sixth grade was transferred to Green. The remaining 1–5 grades had 442 students in 1969. Eastport's capacity is 452. The East Knoxville situation is further complicated by the physical deterioration of the Mountain View School (1–6). In 1969, 303 Negroes were enrolled in this school which has a capacity of 360. Dr. Bedelle testified that the decision had been made to close Mountain View in the 1970 term and shift these students to Green. Future plans propose closing Robert Huff (1–8) and assigning those students to the new school. In 1969, 307 white and 88 Negroes made up a total student body of 395 at Robert Huff. The capacity for 1969 was 399.

Plaintiffs contend that current population shifts would shortly result in an all Negro school; that the school should be located in an area where long range forecasts indicate stability in white residential patterns, thereby maintaining a racial mixture among the students. Dr. Bedelle expressed hopes that the new school would be equally divided racially, but he did not assure the Court of any definite mixture. He testified that there is a theory among education administrators called the "tipping effect" which posits that once a school is attended by 35% of a minority group, students at the school will shortly become exclusively members of the minority group as the other group flees the area. Dr. Bedelle based his hopes that the "tipping effect" would not be operative

in East Knoxville upon two considerations: completion of the urban renewal project may end violent population shifts; and the Board has proposed construction of a very modern school which may tend to hold whites in the area.

The present Central High is one of the older schools that the Board maintains. It has a 1400 student capacity, and these students are in grades 9–12. Twelve portable classrooms have been used there since 1967. A recent cave-in of a wall has made some ten classrooms inoperable. A new school to be called Central, located approximately ¾ miles from the old plant, was about 65% completed at the date of trial. It will furnish facilities for students in grades 10–12 and have a capacity of 1,500. The present Central High School Building will be used as a junior high school thereby relieving all feeder schools. These feeder schools are on the periphery of the city. Some seven Negroes are anticipated to be in the senior high student body when it begins operations about January, 1971.

The Board had purchased the Agee Building adjacent to West High and remodeling there cost $335,000.00. The answer to interrogatory 12 (EXH. V) recites the project is incomplete. Change will apparently only streamline the present operation of West High and not increase the student capacity.

Plaintiffs also pointed out that Northwest Junior and Bearden Senior Highs were also located on the periphery of the city. Planning for the Bearden School was begun in September, 1966; construction began at Northwest on October 21, 1966. Neither of these schools were included in the April 3 Order. In 1969, Bearden Senior High had 22 Negroes in a student body of 1,035; there were two Negroes in the 999 pupils at Northwest. Residential communities surrounding these schools are almost exclusively white.

Doctor Bedelle was cross-examined at some length about the location of new schools. Schools, he explained, were built where student population exceeded the capacity of existing schools. New construction had recently been on the periphery of the city. There was a very heavy increase in the number of school age children in the newly built suburban neighborhoods in West Knoxville. This fact was also evident, but to a lesser extent, in the older neighborhoods around the new Central High School in Fountain City (North Knoxville). When construction was necessary, schools were located as centrally to the students as possible. One factor complicated the actual pinpointing of a school. While possessing condemnation powers, for economic reasons, the Board sought unimproved land, but sites with twenty to thirty acres (the size of the Bearden Senior High campus) were not always readily available in fast developing residential areas.

Doctor Croghan testified that locating new schools on the city's periphery promoted segregation. If all newly constructed schools are located near the inner city, integration, disregarding transportation cost, will be promoted. One cultural advantage flowing from such a location of schools is the displacement of underprivileged children from inner city schools into schools attended by suburban children. Location of only one of several schools near the inner city, like the proposed grammar school, tends to perpetuate segregation, for anticipated residential housing changes will result in racially distinguishable schools.

The Court is of the opinion and finds that schools have not been built to perpetuate a dual system. The Board has established and followed building principles consistent with the neighborhood school system which this Court approved in 1967.

After examining plaintiffs' contentions in the present case, practically all of which were considered in an exhaustive opinion of June 7, 1967, 270 F.Supp. 903, the Court is of the opinion

and finds that the defendant School Board is operating a unitary school system as defined by the Supreme Court in the case of *Alexander,* supra, and that its motion for immediate relief in the form of an injunction must be denied.